**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,    ) Criminal Action
    ) No. 1:21-cr-00598-PLF
              Plaintiff,   )
    )
vs.    ) **Motion Hearing** (via Zoom)
    ) **\*\*\* PARTIALLY SEALED\*\*\***
Terence Sutton (1),    )
and    ) **Washington, D.C.**
Andrew Zabavsky (2),    ) **July 26, 2022**
    ) Time:  1:00 p.m.
             Defendants.   )

_____

**Transcript of Motion Hearing** (via Zoom)
**Held Before**
**The Honorable Paul L. Friedman** (via Zoom)
**United States Senior District Judge**

<u>A P P E A R A N C E S</u>

For the Government:    **Risa Berkower**
(via Zoom)    **Ahmed M. Baset**
    UNITED STATES ATTORNEY'S OFFICE
    FOR THE DISTRICT OF COLUMBIA
    555 Fourth Street, Northwest
    Washington, D.C. 20001

For the Defendant Terence Sutton (1):
(via Zoom)    **J. Michael Hannon**
    HANNON LAW GROUP
    333 8th Street, Northeast
    Washington, D.C. 20002

For the Defendant Andrew Zabavsky (2):
(via Zoom)    **Christopher A. Zampogna**
    ZAMPOGNA, P.C.
    1776 K Street, Northwest, Suite 700
    Washington, D.C. 20006

_____

Stenographic Official Court Reporter:
(via Zoom)    Nancy J. Meyer
    Registered Diplomate Reporter
    Certified Realtime Reporter
    333 Constitution Avenue, Northwest
    Washington, D.C. 20001

<u>P R O C E E D I N G S</u>

1

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  Judge, this is Criminal Action 21-598, United States v. Terence Sutton and Andrew Zabavsky.

For the United States, I have Ahmed Baset and Risa Berkower.  For Terence Sutton, I have J. Michael Hannon, Harrison Richards, and Rachel Amster.  For Andrew Zabavsky, I have Christopher Zampogna.  Our court reporter today is Nancy Meyer.

All parties are present.

THE COURT:  All right.  Good afternoon.  Now I just lost everybody.  I've lost everybody somehow.

THE COURTROOM DEPUTY:  We see you.

THE COURT:  I lost everybody's picture for a minute, and now I see some.  Everybody's coming back in view, I guess.  All right.  I see -- yeah.  All right.

So, look, we're here this afternoon for a hearing on motions, several motions, to dismiss the indictment -- and, first, I apologize for shifting back and forth between in person and Zoom.  I think it's the wiser course at the moment.

So I issued an order yesterday which set forth time

limits, and I will say, for everybody's benefit, I've read

everything carefully, very carefully.  I've read all the briefs

more than once, and reply briefs, and most of the important

cases; and I've given a lot of thought already to the arguments

that have been made.

That having been said, what I suggested in the order

yesterday is that with respect to the first motion, failure to

state a claim, Mr. Sutton's counsel would have 20 minutes;

Mr. Zabavsky 15 minutes; the government 25 minutes; and then

rebuttal, 10 to Mr. Sutton and 5 for Mr. Zabavsky.

And it's similar time limits for the second motion, the

grand jury motion:  20 for Mr. Sutton; 10 for Mr. Zabavsky; 25

for the government; 10 for Mr. Sutton, 5 for Mr. Zabavsky in

rebuttal.

And then Mr. Zabavsky's on selective prosecution,

10 minutes for him and 10 minutes for the government and 5

minutes for rebuttal.

I will say this to everybody:  If you don't need to use

all the time that's allotted, don't.

So, again, I've read everything.  The plan is to take a

15-minute recess after the first argument.  If for any reason

we move more quickly, we can move on to the part of the second

motion before we take our break.

And Mr. Sutton has filed two separate motions.  Dividing

them by the subject matter:  one, failure to state a claim;

1    two, prosecutorial misconduct.

2         Mr. Zabavsky has filed one, but he covers the same two

3    separate grounds, each of which has some subparts; namely, one,

4    failure to state a claim; and two, grand jury abuse, grand jury

5    misconduct.  And, in addition, Mr. Zabavsky has an argument on

6    the selective prosecution.

7         So does anybody have anything they want to say

8    preliminarily, or should we move into the first motion?

9              MS. BERKOWER:  Not from the government, Your Honor.

10             MR. HANNON:  We're ready to proceed.

11             MR. ZAMPOGNA:  We're ready, Your Honor.  Thank you.

12             THE COURT:  Mr. Hannon, are you up?

13             MR. HANNON:  Yes, Your Honor, I am.

14        Thank you.  May it please the Court.

15             THE COURT:  You may need to get closer to your

16   microphone or something.  I'm having a little trouble.  I don't

17   know about the court reporter.

18             MR. HANNON:  How about now?

19             THE COURT:  Yes.  Thank you.

20             MR. HANNON:  It's just me, Judge.  I did a microphone

21   test.  So please let me know if I'm not loud enough.  I'm using

22   my outdoor voice.

23             THE COURT:  Will do.  Thank you.

24             MR. HANNON:  I'd like to begin with four observations

25   that I hope will be helpful to the argument.

1          The first is to try to imagine how this case -- excuse

2     me.  We don't know how the case got into the U.S. Attorney's

3     Office for consideration.  It doesn't say in the indictment.

4     No one in the grand jury explains how the case got to the

5     attention of the U.S. Attorney's Office.  I would submit to

6     Your Honor that whenever it did get to the U.S. Attorney's

7     Office, they had to recognize that any federal charge was

8     impossible.  And I use that word quite intentionally because

9     the obstruction count talks about a communication regarding a

10    possible federal offense.  And if, as a matter of law, it is

11    impossible, then that would have ended the inquiry of the

12    U.S. Attorney's Office.

13         Also, part of this initial observation is that because

14    the U.S. Attorney's Office has a unique position in the

15    District of Columbia and had the opportunity to decide, well,

16    is there anything else we can do -- so they have afforded to

17    them the local common law offense of murder in the second

18    degree, and they chose to proceed with that.

19         I would also like to observe, in connection with this

20    first point, that the District of Columbia also has its own

21    obstruction charge under the local law.  And so one has to

22    consider the fact that the government has achieved pendent

23    jurisdiction on the murder charge by selecting the federal

24    charge of obstruction of justice rather than the local charge

25    of obstruction of justice.  I also, as part of this initial

observation, would observe that if the District of Columbia were, indeed, a state and had its own prosecuting authority, it's very unlikely that any federal charge would have been brought in this case.

My second observation is that the government concedes that *Graham v. Connor* apply to the conduct of Officer Sutton in this case. They say "however." And in my view, the however sets up the main issue of this case. If the answer to the however argument is no, then the Court must dismiss the indictment because the conduct of Officer Sutton is constitutional under *Graham v. Connor*.

So the issue from the perspective of the government is whether a state can create criminal laws that would outlaw perfectly constitutional conduct by a law enforcement officer and subject that law enforcement officer to criminal prosecution -- in this case for murder -- when that conduct is perfectly appropriate under the Constitution pursuant to *Graham v. Connor* and other cases that I cited.

My third point is that we're not going to endeavor to try to answer the first part of that question; that is, whether a state, in fact, can enact a criminal law that's more restrictive than the Constitution. But we certainly are arguing in this case that the D.C. City Council has done nothing to create a statutory crime that would expose a police officer to murder in the second degree when the government

concedes that his or her conduct is constitutional under
*Graham v. Connor*.

My fourth point is really, sort of, a repetition of
subsections. And that is, that there's no dispute that
Officer Sutton's conduct was permissible under the Constitution
and the cases that we have cited.

Regarding but-for causation, I'd like to observe that at
page 4 of their opposition, the government states that Count 1
alleges that Officer Sutton caused a fatal traffic collision in
the course of an unauthorized pursuit. And it cites to a
paragraph in the indictment, which is very brief. And I need
to comment on this because nowhere in the indictment does the
government say that Officer Sutton violated the general order
regarding pursuits. Nowhere. Nowhere. And I find that
significant, and we'll address that a bit later on in my
argument.

So as we indicated in our pleading, our view is that the
standard but-for language that we see in *Jones*, for example,
applies here, plus the common sense that the Court applies to
this case that the decedent [sic] must have committed an act
which caused an injury and the death of the decedent. And I
think the case ends there.

I'd like to observe as well that Judge Easterly in the
*Fleming* concurrence took issue with the expansive nature of the
opinion for the majority, and she complained that the court

should not be making up jury instructions for urban gang

violence where the second-degree murder statute is the common

law and the legislature has said nothing about it. But I think

the applicable objection here from Judge Easterly is the

following: "that we do not punish persons for independent

voluntary actions of others." And the fundamental principle in

that case, from her perspective, is the court should not be

making up a jury instruction for urban gang violence because

that is for the legislature to do.

And if we transfer that thought to this case, the

legislator -- the legislation -- the legislature, as I will

discuss, has not made the common law crime of murder in the

second degree applicable in a case where a police officer is

engaging in reasonable conduct under the Constitution.

In addressing the but-for analysis, the Court can't

ignore the relationship of the defendant and the decedent in

this case, because the --

THE COURT: Before you -- before you go on about

that, is your -- is this part of your argument that there are

two kinds of causation that have to be alleged in the

indictment but-for causation, as well as proximate cause?

MR. HANNON: No, sir. Those are two separate

elements of causation, and the government agrees. And

Justice Scalia in *Burrage* and all the judges in *Fleming* say the

same thing.

1          First, there has to be proof that the actions of the

2     decedent were the but-for cause of the -- excuse me.  The

3     actions of Officer Sutton were the but-for cause of the death

4     of Hylton-Brown and -- and the "and" means there are two

5     elements that may or may not apply to a particular case.

6          In this case I would suggest to the Court that it's very

7     straightforward and the instruction to the jury wouldn't need

8     to go beyond but for.  But, as a matter of law, for Your

9     Honor's evaluation in the indictment in this case, the facts of

10    the indictment don't establish but-for causation at all.  And

11    to pursue that thought, since --

12          THE COURT:  Wait.  Wait.  You stopped in the middle

13    of your sentence.  You said there has to be proof that his

14    conduct was the but-for causation of death and.  And then you

15    gave me -- you didn't tell me what the "and" was.

16          MR. HANNON:  And there -- there is no factual

17    assertions that would support a conclusion, as a matter of law,

18    that the but-for causation is met in this case.  And the

19    reason --

20          THE COURT:  So where does proximate cause fit in?

21          MR. HANNON:  Proximate cause does not fit in.

22    However, let me address what the government says.  The

23    government says that proximate cause is foremost to be

24    considered in this case, and it relies upon some language from

25    *Fleming* that we note in our reply isn't found anywhere in the

1    case law.  And they have said that the answer to our contention

2    in this case is found in the *Fleming* case where it stated,

3    quote, "If one subtracted the defendant's actions from the

4    chain of events, the decedent would not have been killed."

5    That's what they rely upon.  And that is, in my view, a

6    distortion of but-for causation.

7        But it doesn't matter, in any event.  If you apply that

8    in this case, you have to look at the positions of the

9    defendant and the decedent.  The government says that

10   Officer Sutton was engaging in his conduct as a police officer,

11   and they say that it is of paramount importance that he be able

12   to protect the safety of the public.  So you must look at his

13   conduct in that context.

14       The government also says that Mr. Hylton-Brown was --

15   was fleeing because he had committed two traffic violations:

16   he wasn't wearing a helmet, and he was riding a moped

17   erratically on the sidewalk.  So those two facts are in the

18   indictment.

19       What does the case law say in the Supreme Court about

20   the conduct of Hylton-Brown?  The government, apparently, is

21   trying to suggest to the Court that his voluntary, independent

22   conduct is somehow or other the responsibility of

23   Officer Sutton.  And my answer to that is that every single

24   Supreme Court case that we discussed makes perfectly clear that

25   a fleeing misdemeanor -- and I'm not even going to get into the

*Terry* stop because that's not the indictment. A fleeing

misdemeanor has no status under the Constitution. And in every

case, whether the flight is a felon or a fleeing misdemeanor,

the Supreme Court has repeated that they're going to elevate

the paramount standard of the need for law enforcement officers

to protect the public and the suspect -- in this case the

decedent -- has really no rights.

For example, the Supreme Court -- in *Sacramento v.*

*Lewis* -- and this is just one case picking this out. In

*Sacramento v. Lewis*, a pursuit case, the police did nothing to

cause the flight and encourage him to race through traffic

other than to -- other than to not call off the pursuit. As a

consequence in that case, the conduct of those officers was

found to be perfectly constitutional. And because it was

perfectly constitutional, they had no liability for their

conduct. And I must hesitate to point out -- or take a moment

to point out that that means that the conduct of the police

officers was reasonable.

So the government has to explain to the Court how the

conduct, as a matter of law, under any case -- under any

case -- somehow or other provoked or caused Hylton-Brown to

make the decision to ride into Kennedy Street in front of an

oncoming vehicle, which the major crash section of the

Metropolitan Police Department found to have been caused by his

failure to yield right of way.

1    So I hope I've answered the Court's question on that

2    issue, and I would urge the Court to take a look at

3    Justice Scalia's opinion in *Burrage* where he emphasizes the

4    common law origin of the basic principles of but-for causation.

5    There are -- there are seven of them; and the final one is the

6    rule of lenity.  And one of the things that Justice Scalia

7    disposed of was whether the conduct of a defendant in a murder

8    case can be described as only a substantial factor of the

9    death.  And that was the government's argument in *Burrage*, and

10   Justice Scalia refused to endorse that; and the substantial

11   factor test is no longer part of jury instructions in the

12   District of Columbia in murder cases -- or it should not be, as

13   it was in *Blaize*, B-l-a-i-z-e, *v. United States*, a case that

14   was cited by the government in this case.

15   So that brings me to the government's issue of statutory

16   interpretation.  We have to begin with the notion this is a

17   common law crime.  And as Judge Easterly complained in the

18   *Fleming* case, the court shouldn't be going out and making new

19   theories of liability at the behest of the government for a

20   common law crime.  And I would suggest to the Court that's what

21   the government is doing here.  That's what Judge Easterly

22   criticized in the *Fleming* case.  And the government has -- has

23   done it in other instances.

24   They see a problem, they see a death, and they propose a

25   jury instruction that doesn't have any support in the common

1    law.  In *Fleming*, that argument didn't carry the day.  But here

2    it certainly ought to carry the day with Your Honor because my

3    argument of but-for causation is predicated on fundamental

4    cases of the District of Columbia, which are very

5    straightforward.

6    The government, stating the issue at page 11 of their

7    brief, says, "The government agrees with defendant Sutton's

8    assertion that his 'duty to protect the public is of paramount

9    importance,' but it must be carried out within the bounds of

10    the law."

11    So the question is:  What law?  From Officer Sutton's

12    perspective, he is taught to comply with the Constitution.  But

13    the government says, no, we have another law that he has to

14    comply with:  second-degree murder, the common law count.

15    They haven't made any effort to explain how a 1901 --

16    when this statute was adopted for the District of Columbia as

17    an expression of the common law, a police officer, who's

18    engaging in constitutional conduct, would be subject to a

19    murder charge.  There's no evidence that at -- at common law

20    that would have happened.  And that's the first test we have to

21    employ.

22    The second test is the language of the statute, and they

23    emphasis to the Court that it says "anyone."  So, therefore,

24    anyone has to apply to a police officer, but the problem that

25    they have with that argument is they admit that the police

1   officer's conduct -- and they charge him as engaging in his

2   conduct as a police officer -- has to be governed under the

3   standards of *Graham v. Connor*. So in the absence of anything

4   in that statute that says it's specifically intended to apply

5   to a police officer, it can't be applied in this case.

6           THE COURT: I don't understand that. So does

7   the murder statute have to say murder must apply to police

8   officers, it must apply to firemen, it must apply to security

9   guards? It just can't say murder applies to any person?

10          MR. HANNON: No, we're talking about in the course of

11  his duty as a law enforcement officer. And we know that the --

12  and -- and the -- the D.C. Council has not legislated that.

13  And there's, again, as I say, no evidence that in 1901 a law

14  enforcement officer could be indicted even when his or her

15  conduct complies with the Constitution.

16          And there's a reason for that. It's because there's no

17  *mens rea*, and there's no *mens rea* because, as a matter of law,

18  the conduct of the officer is reasonable. It's reasonable.

19          And, in addition to that, we know from *Graham v. Connor*

20  that the Supreme Court did away with the intent required to sue

21  under 1983. Prior to 1989, when *Graham v. Connor* came down, to

22  sue you had to show that the conduct of the officers was

23  subjectively malicious or sadistic, and that got -- got rid of

24  that hurdle for a 1983 action because the intent of the

25  officers is irrelevant, as the Court knows, if the conduct of

1   the officers complies with the Constitution.  And that -- that

2   principle is applied in criminal cases and it's applied in --

3   in cases under 18 U.S.C. 242.

4       And how could the government argue that this statute

5   should be construed in that manner when there's not a single

6   case in the District of Columbia or in the United States that

7   they have brought to our attention -- or in the federal

8   jurisdiction -- where this statute has been applied to the

9   conduct of a law enforcement officer whose conduct complies

10  with the Constitution.

11      On the contrary, as we've indicated in our brief, if one

12  spends a little bit of time with a textbook written by

13  Rachel Harmon, who's at UVA -- and used to be in the civil

14  rights division of the Department of Justice -- she says that

15  there is a law enforcement authority privilege enacted in every

16  single state of the union.  And I suggest that when the

17  D.C. Council enacted the statute making it -- making it a

18  potential crime of assault and battery for a police officer to

19  use excessive force, they had in mind the principles of the

20  Constitution in *Graham v. Connor*, even though I think that

21  preceded *Graham v. Connor*.

22      And we know from Title V, which the government has never

23  cited -- I don't know whether the government was aware that

24  before this incident the District of Columbia City Council had

25  enacted a variety of legislation under Title V which applies to

1    police officers, firemen, and medical examiners, where they had

2    also outlawed the use of excessive force.

3            So the answer to the Court's question is, if you -- if

4    you apply the principles of statutory construction, it doesn't

5    say it.  There's no precedent in the common law when dealing

6    with police officers.  They legislate in Title V.  There's no

7    case even close to this one, except for *Blaize*, perhaps, which

8    was predicated on the substantial factor test, and the

9    government isn't relying on it here.

10           And the Court knows that as a matter of statutory

11   construction, the government can't rely on D.C. Municipal

12   Regulations.  Those are not enacted by the city council.  They

13   point to D.C. tort law where there is an exception to immunity

14   for gross negligence in civil cases.  That's a civil case.

15   They point to his training, and they point to case law.  None

16   of those things can be taken as an expression of intent of the

17   D.C. City Council.  Moreover, none of those were alleged in the

18   indictment.

19           I've gone over my time, Your Honor, and I haven't

20   reached the obstruction counts.

21           THE COURT:  Why don't you talk about obstruction.

22           MR. HANNON:  Thank you.

23           Impossible.  It's impossible to indict Officer Sutton

24   under 18 U.S.C. 242.  It's impossible as a matter of law.

25           THE COURT:  Say that again.  It's impossible to

1   indict him?

2           MR. HANNON:  It's -- yes.

3           THE COURT:  Under what?

4           MR. HANNON:  The government has -- the government has

5   agreed -- let me see my -- let me see if I have a -- I'm a

6   hundred, so...

7           The government -- the government has agreed that there

8   is no violation of the Constitution.  They've agreed in their

9   papers.  They've agreed in argument before the Court.  They've

10  said it's irrelevant to this indictment.  So we know that there

11  is no violation of the Constitution by Officer Sutton, nor are

12  there any facts alleged which could constitute a violation of

13  the Constitution.

14          Therefore, if the government, the federal government,

15  the U.S. attorney, were given this case and they were thinking

16  about bringing a federal case, the only federal case that they

17  could bring is a deprivation of the Constitution right of

18  Hylton-Brown, or even think about.  However, they know as a

19  matter of law -- and they've admitted in this case -- that

20  there can be no federal prosecution on the facts of this case

21  under Title 18, section 242 because it requires the defendant

22  to have knowingly acted to violate the constitutional rights

23  of -- of the decedent or the suspect.  And the government has

24  admitted and the facts concede that that is impossible in this

25  case.

1       So with respect to obstruction, the language of the

2   elements of obstruction in the statute say that the

3   communication that the defendant has engaged in must be

4   designed to delay the investigation into a possible or actual

5   federal offense.  Possible.  In this case, as a matter of law,

6   it is impossible.  It doesn't matter how long the

7   U.S. Attorney's Office scratched its head and deliberated on

8   this.

9       You, Your Honor, as a matter of law, can conclude, just

10  as you did in the *Williams* case, going the other direction,

11  that this was impossible from the very beginning.  Impossible

12  because there is no federal offense that could have been

13  charged.  This -- this case -- and if you look -- as Your Honor

14  knows, you had to look at *Fowler* in considering a post-trial

15  motion in the *Williams* case.

16      And in the post-trial motion in the *Williams* case, as

17  did many other defendants, they said look at the Supreme Court

18  decision in *Fowler*.  And in the *Williams* case, the instruction

19  to the jury about the possibility of a federal offense was not

20  as stringent as *Fowler* required.

21          THE COURT:  Which *Williams* case are you talking

22  about?

23          MR. HANNON:  Yours.

24          THE COURT:  Rico Williams?

25          MR. HANNON:  Sir?

1          THE COURT:  Rico?  Rico Williams?

2          MR. HANNON:  I've got everything but his first name.

3          THE COURT:  Is that the guy at the Army base in

4     Germany?

5          MR. HANNON:  Rico Rodrigus, yes.

6          THE COURT:  Rico Williams in Germany?

7          MR. HANNON:  Yes.  And I -- I raise that case because

8     you found the instructions were erred, but harmless error,

9     because it wasn't raised and they should have raised it based

10    upon the status of the law.  But in that case --

11         THE COURT:  The Court of Appeals thought it should

12    have been a manslaughter charge, not a murder charge.

13         MR. HANNON:  There's manslaughter in the federal

14    code.  But -- but you observed -- this occurred on Ramstein

15    Air Base in Germany, and that was a factor that, among others,

16    was dispositive of the issue that under obstruction there was a

17    possible or potential federal case because --

18         THE COURT:  Well, there was a federal offense

19    because the federal statute says, specifically, that if

20    somebody commits murder, an American overseas --

21         MR. HANNON:  Yes.

22         THE COURT:  -- that this Court has jurisdiction,

23    and --

24         MR. HANNON:  Absolutely.

25         THE COURT:  -- and what happened with Williams was

that everybody except Rico was still in the military. And they were all charged -- they were all court-martialed. And Rico had a medical discharge a month or so before the -- the homicide, the manslaughter, or second-degree murder, as the case may be. And there was a statute, a specific statute -- I can't remember -- that says you've got to be able to charge him somewhere; so federal law says you charge him with murder under 18 U.S.C. 111, I believe, which is a federal murder statute.

MR. HANNON: Yes, sir, I am very familiar. The point I'm making here is that when the Court looks -- and you look only at the -- the indictment here. When the Court looks, you're looking at your understanding of the law and the facts that are alleged.

This did not occur on Ramstein Air Force base. This occurred in the District of Columbia. And as I indicated to Your Honor, as a matter of law, which is what you look at in the *Williams* case -- as a matter of law, in the *Williams* case there was a statute that said if you're in Ramstein Air Force base or any other government facility around the world, you can be indicted for a federal offense. And he didn't necessarily have to know that. Some cases that there has to be some -- some knowledge of that.

And the government in this case suggests without any proof that Metropolitan Police Department officers have been -- have been taught that.

1      But my point is this:  That you're in the same seat that

2  you were in in the *Williams* case, except you're looking at an

3  indictment, and so as with the *Williams* case, you put your

4  legal scholar hat on, and there is no federal crime that arises

5  out of the facts of this case.  And the government admits that.

6  There is no possibility of a federal crime.  It is impossible.

7      There's also no allegation that Officer Sutton violated

8  the MPD general policy on pursuits.  That's very important.

9  There's -- there's no allegation that he did at all.  And

10  here's the reason that's important:  Because if you look at the

11  indictment as having two phases -- the collision phase and the

12  4D phase -- at the collision phase, Officer Sutton couldn't

13  have the intent to cover up wherever the violation of the

14  vehicular pursuit law would go because the government hasn't

15  alleged there was a violation of the vehicular pursuit law.

16      The other thing that the government says that was

17  covered up is that at the scene -- and they -- they gave you a

18  picture of the pool of blood that they like to talk about.  At

19  the scene, the officers saw -- Officer Sutton, briefly, saw

20  Hylton-Brown as he lay in the street.  And what the government

21  says in the first part of the indictment is that he had a gash

22  to his forehead and there was blood.

23      In the second part of the indictment, where they're

24  talking about obstruction, they're trying to hide from officers

25  who, somehow or another, are going to suggest there's a federal

crime here; that they violated the vehicular pursuit rule.

The indictment says they didn't. I'm sorry. Let me restate that. The indictment doesn't say they did. So they had no reason to be concerned that what they did needed to be covered up.

And in the second part of the indictment, the government alleges that when Officer Sutton went back to 4D, he told Zabavsky and he told the watch commander, Porter, that there wasn't a pursuit. I didn't participate in a pursuit. That's exactly correct, as far as the indictment is concerned. So one cannot assume that that is a violation or any attempt to hide anything.

THE COURT: Well, but let's go back to basics here. This is a motion to dismiss an indictment for failure to state a claim, and now you're arguing evidence. You're arguing what the government says as opposed to what the evidence at trial will show. And a motion to dismiss for failure to state a claim, we've got to look at the allegations in the four corners of the indictment and see if they set out a criminal offense; right?

MR. HANNON: Yes. I'm sorry, Judge. The -- the fact that the indictment defines the general policy of vehicular pursuits, it defines it in the indictment in two aspects. And then it goes on to recount the conduct of Officer Sutton -- intermittently turning on his siren, turning on his lights

intermittently -- and never says that he violated the general

policy on pursuits.  So there's nothing that's been alleged

that he has any intent to cover up while he's at the collision

scene.  They haven't alleged that there was anything he did

wrong at the collision site.

Then the second part of that -- and this is in the

indictment -- they say that he minimized the observable

injuries to Hylton-Brown when he prepared his police report.

Now, the police report is not recreated in the indictment, but

let me back up just a moment.

The indictment does say that the observable injuries

were a gash on the forehead.  The government has presented

photographs.  The government has presented the actual draft

report itself.  You have seen that.  The draft report states

there were abrasions.  There is no difference fundamentally

between what is contained in the draft report and the

indictment regarding what are the observable injuries.

In their pleadings, the government tries to say that

they failed to pass on information about the grievous medical

condition.  That's at page 24.  It says they were both aware of

the, quote, grievous medical condition.  The indictment doesn't

say that they have to determine whether he was at a grievous

medical condition.  The indictment says they're only

required -- it doesn't even say they're required, but the

indictment only -- only says that they should have recorded,

quote, the observable injuries.

Now, the government really doesn't address the fact that they have made available to you -- and we've litigated the issue -- let me back up on that. But they have made available to you in the pleadings the actual draft, because we've said several things about the draft report besides the fact it wasn't misleading.

And you permitted, as you have done in -- in cases yourself -- you're permitted to look at the actual report, draft report, read what's there, and conclude that it -- it's not misleading in terms of the observable injuries on its face; and that's my point with respect to that.

So what the indictment does on its face is it -- is it sets up two things: the observable injury, the trauma to the head, and the violation of the general order; and then claims in the second part that they try to hide those two things. But there is nothing to hide.

I would like to make -- make one last point outside the pleading. It's occurred to me to consider whether the government has ever charged an obstruction of justice without connecting it to an underlying federal offense. Usually, as in the *Williams* case, there's an underlying federal offense that the defendant attempts --

THE COURT: Which *Williams* case are you talking about now?

1          MR. HANNON:  Oh.  I -- I guess there's a

2     Supreme Court -- I'm talking about the Court's *Williams* case.

3          THE COURT:  Well, my *Williams* case was tampering with

4     a witness.  So that's a separate charge.

5          MR. HANNON:  Sure.  Yes.

6          So it occurred to me when I read the *Snyder* case, which

7     we've cited in our briefing, in *Snyder* they -- they dismiss the

8     count after trial because the robbery of the particular bank in

9     that case, that there was no reason for the defendant to

10    believe that that bank would -- if he robbed that bank it would

11    be a federal offense.  You know, it wasn't -- it wasn't the

12    Bank of the United States.  And the government found a way to

13    indict him, and the court afterwards threw it out saying, you

14    know, he had no reason to believe that.

15         In any event, *Snyder* led me to be concerned because it

16    talked about the underlying offense all the time.  It said

17    whether he had reason to believe that there was a possible

18    federal violation, and he refers always to the underlying

19    offense.

20         That language is not in *Fowler*, but Justice Breyer in

21    *Fowler* does talk about the other offense charged and considers

22    whether the other offense charged satisfies the possible

23    federal offense.  The -- the likelihood, the nexus issue.  And

24    it occurred to me, has the government ever indicted an

25    obstruction case without an underlying federal offense?

1          And I found two, and I can't say my research is

2     exhaustive.  I found two, one in which a prison warden was

3     indicted for helping his underlings cover up the beating of a

4     prisoner -- and I would suggest -- I don't know whether they

5     were indicted elsewhere, but that's pretty clear.  And the

6     other one is where co-defendants were indicted for the

7     underlying offense of murder and -- and someone came in and

8     tried to help them cover it up.  And so --

9          THE COURT:  Well, that's what that -- isn't that

10    what -- charges in this case?

11         MR. HANNON:  In?

12         THE COURT:  In our case.

13         MR. HANNON:  In our case?

14         THE COURT:  In our case there was an underlying

15    charge of murder and the -- and the allegations that Mr. --

16         MR. HANNON:  It's not a federal -- it's not a federal

17    offense.

18         THE COURT:  All right.  Well, you've made that

19    argument.  I get it.

20         MR. HANNON:  Yeah.  So that's my point.  Under the

21    obstruction count, it has to be a federal offense, and my --

22    my -- my point to you is I haven't exhausted the

23    determination -- the research to conclude whether or not there

24    has been to be an underlying federal offense, for it to be

25    sufficient.  But I believe that my argument that as a matter of

1    law -- as soon as they left the scene, as a matter of law, that

2    could not have been a federal offense as to trump the

3    indictment in this case, because that's what the Court looks at

4    in determining when --

5           THE COURT:  Okay.  We're ready for Mr. Zampogna.

6           MR. HANNON:  Thank you.  Thank you, Your Honor.

7           MR. ZAMPOGNA:  Thank you, Your Honor.

8        I'm going to focus specifically on the indictment and

9    how we believe that it has to state more than just the general

10    terms of what's being charged, which has been defined in

11    *Russell v. U.S.*

12        The indictment states the wording of the statute, 18

13    U.S.C. -- my client, of course, has been charged with

14    obstruction, which is 18 U.S.C. 1512(b)(3).  "Whoever

15    knowingly . . . engages in misleading conduct toward another

16    person with intent to hinder, delay, or prevent the

17    communication to a law enforcement officer . . . of the

18    United States of information relating to the commission or

19    possible commission of a Federal offense."

20        Now, the indictment similarly states, close to verbatim,

21    knowingly engaged in misleading conduct toward another person

22    and attempted to do so with intent to hinder, delay, and

23    prevent the communication to law enforcement officers of the

24    United States, information relating to the commission of the

25    possible commission of a federal offense.

It goes on to state a little bit more; that is, Sutton and Zabavsky hid from the MPD officials the circumstances of the traffic collision leading to Karon Hylton-Brown's death to prevent an internal investigation of the indictment and referral of the matter to the federal authorities for a criminal civil rights investigation.

As was started to be brought out by Mr. Hannon just a little while ago, which leads into this argument, the reason it has to be more than just this basic statement is we have to prepare our defense. And in -- in contrast, what has been said -- stated to us -- and this indictment isn't specificity that's needed -- that's required for us to -- and is required for you to review these four corners of the indictment to decide if it's been alleged beyond merely stating the wording of a statute.

And then I'd like to further go on and to focus on the word "misleading." Now, misleading conduct is a necessary element of obstruction of justice of 18 U.S.C. 1512(b)(3). And there are definitions also within that, 18 U.S.C. 1515(a), subsection (3) where there are five separate definitions.

Now, the indictment itself, as we're sticking with these four corners, doesn't define -- or doesn't state which of these definitions the government plans to use in its charging process. And, in fact, it doesn't reference anything in that section. And these definitions are --

1          THE COURT:  Well, can I ask you this question.  I

2     mean, I recognize that they didn't cite 18 U.S.C. 1515(a)(3).

3     They didn't cite the statute.  But are you saying that if you

4     compare these five kinds of misleading conduct and in 1515 you

5     do not find anything alleged in the indictment, that matches up

6     with any of those?

7          MR. ZAMPOGNA:  Well, they didn't state it does.  I

8     guess I can surmise and start looking through it, but I mean --

9          THE COURT:  Well, you don't have to surmise it if

10    we're looking at the four corners of the indictment.

11         MR. ZAMPOGNA:  Well, I was about to get to that,

12    yeah.  So I -- I -- it doesn't have the requested specificity

13    is what the argument that I'm trying to make is -- is that

14    these -- these definitions should have been provided or at

15    least attached to some form of a fact in the indictment.  And

16    they are knowingly making false statements -- I'm just going to

17    summarize, (b) is intentionally omitting information; (c) is

18    with intent to mislead, knowingly mislead, submitting, or

19    inviting reliance on a writing that is false, forged, or

20    altered; (d) with intent to mislead; and (e) knowingly using a

21    trick or scheme.

22         So as I'm -- you know, I'm being more specific, in a

23    sense, of my argument.  I'm just going -- just directly at the

24    wording.  I believe the wording isn't specific enough for --

25    for us in this case.

1     And -- and in this -- this issue is also touched upon by

2     Attorney Hannon earlier about the federal nexus.  He mentioned

3     that terminology, and there is a federal nexus requirement,

4     which we argue the federal nexus test requires that it be

5     reasonably likely that this misleading information be

6     transferred to a federal official.  And I think we've spoken

7     *Fowler* earlier where *Veal* over- -- partially overruled that.

8     But that's where the -- that's where that comes into play.

9     So the government further claims that the federal nexus

10    originated from events occurring prior to the defendant leaving

11    the scene of the accident, if you look on page 24 of the

12    opposition.  These events -- however, in their argument they

13    state that the events taking place in the Fourth District are

14    those that applied -- instead of providing the federal nexus,

15    they provide an accounting of misleading conduct.  So they skip

16    over the federal nexus section.

17    And it isn't reasonably likely that there would be a

18    transmission until my client, Mr. Zabavsky, was at the Fourth

19    District.  This reasonably likely standard comes from *Fowler*.

20    Meanwhile, the alleged misleading conduct for the obstruction

21    of justice charge, as we've stated and Mr. Hannon has even

22    mentioned as well, was supposedly or allegedly at the police

23    station.  And the government has admitted as much, saying,

24    quote, when he misled them after returning to the Fourth

25    District.  That's on page 23 of their opposition.

1      So the alleged federal nexus is unrelated to this

2 obstruction of justice charge, we argue, and for these reasons,

3 it doesn't contain that nexus that's required, and the charges

4 should be dismissed.

5      That's all I have, Your Honor.

6      THE COURT:  I muted myself.

7 Thank you, Mr. Zampogna.

8      MR. ZAMPOGNA:  You're welcome, Your Honor.

9      THE COURT:  So let's hear from the government in

10 response to the arguments, both in the briefs and specifically

11 some of the arguments made today by counsel for the two

12 defendants.

13      MS. BERKOWER:  Good afternoon, Your Honor.  Risa

14 Berkower for the government.

15      THE COURT:  Yes.

16      MS. BERKOWER:  Your Honor, I would say that you are

17 right when you told Mr. Hannon that we should go back to

18 basics.  Many of the arguments that were made by Mr. Hannon

19 stray far, far outside the four corners of the indictment and,

20 as a result, have no bearing on what the Court should do on a

21 Rule 12 motion.  As the Court is well familiar, Rule 12 motions

22 require looking just within the four corners of the indictment,

23 and that's all that's required here.

24      So with regard to what is in the indictment, I'll start,

25 first, with the initial arguments that Mr. Hannon made

1    concerning causation; and then I'll turn to his arguments about

2    the Constitution, whether -- whether there has to be a

3    constitutional violation alleged.

4         But with regard to whether there is proper causation

5    alleged for purposes of a second-degree murder charge, I would

6    submit that the defendants' characterization of causation is

7    just not correct.  The D.C. Court of Appeals has made clear

8    what causation is for the second-degree murder statute when it

9    comes to both actual cause and proximate cause, and that's the

10   *Fleming* case.

11        And I would note as an initial matter that Mr. Hannon

12   said in his argument and in his brief that -- that causation

13   requires the defendant, quote, inflicted injury on the

14   decedent.  And in *Fleming*, the D.C. Court of Appeals expressly

15   rejected that as proper causation.  They said that is not true.

16   And the reason that's not true is because, as Your Honor noted,

17   *Burrage*.  *Burrage* explained that there are two components to

18   causation, actual cause and proximate cause.  And in *Fleming*,

19   the court -- the majority of the court -- I know Mr. Hannon

20   repeatedly cited to the dissenter, but that's not the governing

21   authority.

22        THE COURT:  Well, I think he says she concurred; that

23   Judge Easterly, the dissenter, concurred.  It doesn't matter.

24        MS. BERKOWER:  She concurred in the judgment.  She

25   concurred in the judgment only.  Because at the end of the day,

the majority overturned the conviction and sent it back. But she disagreed with the reasoning of the majority and with the conclusions reached by the majority concerning causation.

And the majority of the DCCA put forth a jury instruction, not just for urban gun battle cases, which is what was at issue in that case, but for all second-degree murder cases. And it explained there are two components to causation.

The first is that the actual cause requirement -- and they said in the jury instruction that they put forward for all second-degree murder cases, the government must prove -- to prove actual cause; that if one subtracted the defendant's action from the chain of events, the decedent would not have been killed. And so, significantly, that means only that if the defendant's actions were part of the chain of events -- it doesn't require that the defendant was the most immediate cause of the death, the final cause, the last link in the chain, the final shot that killed the defendant, the -- that killed the victim, the car that actually struck the victim; but if you took him away from the chain of events that led up to that moment, actual cause is proven.

And I point that out expressly because I know the defendant has emphasized several times that because the -- Mr. Sutton didn't hit Mr. Hylton-Brown, actual cause is defeated. And that's just not true under the DCCA standard. If it were true, I would note, there would be some absurd

1    results, which is if Mr. Sutton had pushed Mr. Hylton-Brown

2    into oncoming traffic, he could not be held liable.  And we

3    know that's not true, both as a matter of common sense and as a

4    matter of DCCA case law.  The *Blaize* case, which Mr. Hannon

5    noted, at the time it was decided, was based on the

6    substantially contributing factor standard, was still cited

7    with approval in *Fleming* for purposes of causation principles.

8        And the DCCA noted in *Fleming* that that's because if

9    you're in the chain of events, if you set off the chain of

10   events, that but for you participating in that, the death would

11   not have happened.  You are -- you are liable.  You are an

12   actual cause of the death.

13       The second requirement that the DCCA imposed for

14   causation is proximate cause, as Your Honor alluded to earlier.

15   And for that, the jury instruction said that the government

16   must prove there's a close connection between the defendant's

17   actions and the decedent's death and that that can be proven if

18   the defendant knew or reasonably should have known that his

19   action might result in death.

20       Now, that part of the causation requirement addresses

21   whether the death is reasonably foreseeable or too far removed

22   in time to fairly hold the defendant responsible.  But *Fleming*

23   gave a yardstick for how to measure whether proximate cause is

24   established, and that is reasonable foreseeability.  If it's

25   reasonably foreseeable that if the defendant engaged in

1    particular conduct, the death would result, even if it's

2    through the intervening conduct of a third party -- and the

3    DCCA was very clear on that point -- that proximate cause is

4    satisfied.

5         I would also note, then, when it comes to proximate

6    cause, *Fleming*, noted Mr. Hannon, was very dismissive of some

7    of the civil tort cases out of the DCCA in prior years that

8    *Fleming* noted; that proximate cause analysis is generally the

9    same in civil tort claims and in criminal cases for these

10   purposes.  And while it's not -- civil cases, of course, are

11   not determinative in the criminal context, they deal with, you

12   know, different matters, those principles run similarly and are

13   informative of -- of both lines of cases.

14        Now, applying those principles of causation to the

15   indictment, it is properly pled here.  The indictment contains

16   numerous allegations that the defendant engaged in dangerous

17   driving when he pursued Mr. Hylton-Brown, ultimately chasing

18   him through the final alleyway onto Kennedy Street where he was

19   struck and killed.  The indictment has a lot of very specific

20   allegations that Mr. Sutton initially pursued the victim for a

21   minor traffic violation, including not wearing a helmet, which

22   is relevant because, at the end of the day, that made it more

23   foreseeable that this kind of conduct would result in a serious

24   injury or death to Mr. Hylton-Brown.

25        He knew Mr. Hylton-Brown -- he knew that the MPD policy

1    did not allow a chase for a traffic violation.  And I point

2    that out in paragraph 8.  Mr. -- Mr. Hannon made several

3    statements in his argument that there's no alleged policy

4    violation and that the officers knew.  Paragraph 8 expressly

5    says that the officers -- both defendants knew MPD policy

6    regarding vehicular pursuits and that the policy prohibited

7    officers from pursuing a vehicle to effect the traffic spot.

8         In addition to this, the indictment alleges that the

9    pursuit went on for three minutes, over ten city blocks; that

10   Mr. Sutton reached double the speed limit at times; he drove

11   through two narrow alleyways; he ran through several -- seven

12   stop signs; he went the wrong way up a one-way street; he

13   accelerated and then slammed on his brakes at the last minute

14   to avoid a collision at times to Mr. Hylton-Brown's motorbike;

15   he only used his lights and sirens intermittently; and in the

16   final alleyway, he turned off his emergency equipment,

17   accelerated to get closer to Mr. Hylton-Brown, and flushed

18   Mr. Hylton-Brown into the street where he was struck.

19        And we submit that taking those facts as true, which is

20   required on a Rule 12 motion, if we prove those to the jury, we

21   will have established that this chain of events -- subtracting

22   Mr. Sutton's conduct from this chain of events, the death would

23   not have occurred, and that meets the actual cause requirement.

24        And given the facts and circumstances of the chase --

25   his driving decisions, it was -- especially in the final

alleyway where he turned off his emergency equipment so no one

on Kennedy Street would know this was coming -- taking all that

as true, it was fully, reasonably foreseeable that a third car

would be driving down the street unaware of what was coming and

would strike Mr. Hylton-Brown.  And because of that, the

indictment properly alleges proximate cause as well.

I would note that there is no DCCA decision, nor has

Mr. Hannon cited one, that says a police officer can't be held

liable on these facts that would allow just a decision, as a

matter of law, on Rule 12; and that the DCCA also has never

said there's no proximate cause because the police officer is

carrying out his duties.  I know that was an argument advanced

in one of the briefs that I -- I don't think Mr. Hannon raised

today.

THE COURT:  What was your last point?  The D.C. Court

of Appeals does not exempt police officers, and then you said

something else.

MS. BERKOWER:  There -- the DCCA has never said

there's no proximate cause -- that the proximate cause is

somehow cut off because a police officer is in the course of --

of carrying out his duties.  That's not something Mr. Hannon

advanced today, but I think it was in one of the briefs.  So I

just wanted to point that out for the Court.

THE COURT:  But if the charge had been under

18 U.S.C. 242, there is -- there is that, sort of -- well, you

1    can explain the difference.  But there is either an extra

2    element which -- or defense which, essentially, parallels civil

3    liability for public law enforcement officers, but not -- but

4    not in a murder.

5              MS. BERKOWER:  Correct.

6         And I can move on to talk about the constitutional case

7    law now.  I just -- I think with regard to just looking

8    specifically -- because that was one of Mr. Hannon's claim,

9    that Count 1 did not properly allege causation -- we submit

10   that it does because the allegations in the indictment, taken

11   as true, meet both required elements set out by the DCCA in

12   *Fleming*.

13        So moving on to the constitutional points that

14   Mr. Hannon has raised and that Your Honor has asked about, when

15   it comes -- there's no question -- and Mr. Hannon even, to some

16   degree, conceded at the start of this that officers are subject

17   to state laws unless there's an exception.  And there's no

18   exception here.  And we would submit that all of the

19   constitutional case law that he just cited, all of the "what

20   if" this was charged under 18 U.S.C. doesn't matter because

21   that's -- it's not on topic.  It's not what we're talking about

22   here.

23        We're talking about the fact that this conduct by

24   Mr. Sutton violated a D.C. criminal statute.  Period.  There

25   doesn't have to be a constitutional violation because police

1    officers are subject to generally applicable laws unless an

2    exception is made.  And the Constitution does not give them an

3    exception.

4         When it comes to Constitution -- the Constitution, it

5    sets a floor, not a ceiling, for permitted conduct by officers.

6    And so when an officer is charged -- to answer Your Honor's

7    question, when an officer is charged under 18 U.S.C. § 242, the

8    elements that you're looking at are very different.  You're

9    looking at whether under the facts and circumstances at the

10   time there was a willful deprivation of a constitutional right

11   while acting under color of law.  There's four elements --

12   well, there's an additional element if it's a felony.  There

13   has to be an injury or a death or use of a weapon.

14        And that's a very different question from whether or not

15   a specific state law was violated.  The Constitution applies

16   all the time.  We don't -- we don't suggest that it doesn't

17   apply.  Of course, everyone has constitutional rights, contrary

18   to Mr. Hannon's suggestion in his initial brief.  You don't

19   forego your rights somehow.  Your rights may be deemed to be

20   not the prevailing -- it may be the case that under certain

21   circumstances involving law enforcement, the law enforcement

22   interests outweigh your own interests in privacy or bodily

23   integrity or whatever it may be.  You never forego those

24   rights.

25        But that being said, the Constitution is silent on a lot

1    of conduct in modern life.  And the Supreme Court has

2    repeatedly said that when that's the case, states and local

3    jurisdictions can step in and legislate.  Those are the lessons

4    of cases like *Morrison* and *Lopez*.  That the federal reach is

5    not universal.

6        And when the federal reach doesn't -- when federal

7    requirements don't speak to a certain issue, the state can step

8    in and require more.  And that's especially the case when it

9    comes to police officers acting under color of law who are

10    vested with the authority of the state.

11        The defendant even seems to concede that state laws

12    apply to him because he cited some of the express state laws

13    that D.C. has enacted governing specific types of police

14    conduct.  And to say that he can -- he is subject to those

15    laws, but not the laws of general applicability, would lead to

16    a completely absurd result.  It would allow him to pick and

17    choose what laws he is subject to.

18        I would note for the Court that there are several types

19    of conduct that, I think it's intuitive, police officers

20    certainly cannot engage in that are covered by laws that are

21    not the Constitution, that aren't constitutional violations.

22    So one example would be bribery.  It's not unconstitutional to

23    take bribes, but that's certainly not something an officer can

24    do in the line of duty.

25        An officer -- it's not unconstitutional to steal

contraband from a drug dealer.  The drug dealer has no

Fourth Amendment interest in property, but that's not something

a police officer can do in the line of duty.  It's not

unconstitutional for an employee to engage in a quid pro quo

for sex with someone he pulls over at the side of the road to

allow them to leave without an arrest or a charge.  That's not

a constitutional violation if there's consent there, but it's

certainly not something that we would expect the officer to be

able to engage in without consequence.

And I would note that most tellingly of all,

obstruction, the count -- Count 2 and 3 of the indictment,

conspiracy of obstruction, those are not constitutional

violations.  But those were committed in the line of duty, and

Mr. Hannon has never once challenged those counts because they

don't -- they aren't prohibited by the Constitution.  Of

course, officers can be charged with crimes that aren't

specified in the Constitution, and that's because the

Constitution sets a floor, not a ceiling, for what is

permitted.

Because of this --

THE COURT:  I'm thinking of -- there's a case this

term in the Supreme Court having to do with opioids and whether

or not drug manufacturers can be sued or even charged

criminally.  And it mentions in passing an old case from the

Supreme Court, *United States v. Thomas Moore*, which was a case

in which a pharmacist or a doctor was charged with a felony for running a drug mill and prescribing -- having hundreds of hundreds of, quote, unquote, patients every day and distributing drugs and charging each patient for the visit, depending upon the amount of drugs.

And the D.C. Circuit, to the surprise of many, in a two-to-one decision, said, well, doctors can only be charged with the regulatory and administrative parts of the Controlled Substances Act because they have licenses and pharmacists have licenses, and you can't charge them like you charge a drug dealer. And the Supreme Court unanimously said yes, you can when they act like a drug dealer instead of like a doctor.

So, I mean, that was the generally applicable law that by its own terms -- not -- not by some inference, had special provisions that were administrative in misdemeanors for doctors and pharmacists. But the Supreme Court didn't have any trouble saying, but when you cross certain lines, you're just like everybody else and your medical license doesn't protect you.

MS. BERKOWER: And we would agree that that's the exact reasoning that applies here. The second-degree murder statute does not exempt anyone. It says whoever. There's been no law by the D.C. Council that exempts classes of people, including officers, from that statute and, as a result, is a law of general applicability that applies equally to this defendant when his conduct meets the elements of the charge,

1    which we -- which we submit is alleged properly in the

2    indictment.

3         I know Mr. Hannon believes that there will be many --

4    and there will be many factual disputes, I'm sure, at trial

5    about whether there's a requisite mental state, whether or not

6    we prove those elements.  But as alleged, the elements of the

7    generally applicable law have been properly included in this

8    indictment, and there's no basis to dismiss it as a result.

9         And unless Your Honor has further questions about either

10   of those two pieces of the argument, I'll move on to Counts 2

11   and 3.

12             THE COURT:  All right.  Go ahead.

13             MS. BERKOWER:  So with regard to Counts 2 and 3,

14   again, I would submit that we have to look at the four corners

15   of the indictment.  That's fundamental principles.  And in this

16   case, the indictment is very clear and very specific about the

17   type of obstruction that is alleged.

18        And I guess I'll start with Mr. Hannon's claim that it

19   would be -- it is -- because it's impossible to indict this

20   case under 242, then it's impossible for there have been -- to

21   have been an obstruction here.  And I think that's based on a

22   fundamentally flawed principle that ignores the statutory

23   language.

24        The statutory language is -- of 1512(b)(3) talks about

25   the information pertaining to the commission or possible

1    commission of a federal offense.  And at the time that this

2    incident occurred, there was certainly a possible federal

3    offense.  Mr. Hannon has hinted at it since the beginning of

4    this case:  Why wasn't it charged under 18 U.S.C. § 242.  That

5    was something that was, of course, under investigation because

6    there's an officer on his official duties involved with someone

7    who was killed because of his own conduct.  Of course, that is

8    a possible federal offense.

9         It doesn't matter if the federal offense was never

10   charged at the end of the day, because Congress, when it

11   enacted 1512(b)(3), wanted to ensure that there was no

12   interference with even potential criminal investigate --

13   investigations into possible criminal conduct.  And so it's

14   just not the case that this was impossible from the outset and,

15   therefore, that somehow defeats this count.

16        With regard to the federal nexus, I would say --

17             THE COURT:  Before -- maybe that's related to the

18   point you're about to make.  But there's an inference or maybe

19   even a statement in his argument that -- but at the end of the

20   day, you concluded it was impossible and you chose the easier

21   route.  You couldn't prove the elements of 18 U.S.C. 242, and

22   it's easier to prove common law murder.  So that seems like it

23   wasn't really possible; and, therefore, you can't have federal

24   obstruction.

25             MS. BERKOWER:  I -- I disagree with that

characterization, Your Honor.  And the reason for it is
Mr. Hannon seems to think that if there wasn't a
Fourth Amendment seizure here, there's no potential
constitutional violation.  And that's just not true.  The
Fourteenth Amendment applies if the Fourth Amendment doesn't.
And, as a result, it would be possible to charge this as a
Fourteenth Amendment violation under 242.

The fact that it wasn't Mr. Hannon himself who listed
several cases that -- where obstruction charges were brought
without an underlying 242 count, I'm sure we could find more.
I know of one that was charged recently in the Middle District
of Tennessee where there was an investigation into a
possible -- possible sexual assault in a jail.  The jailer lied
about it, obstructed the investigation into that, and was
charged only with obstruction, not with the underlying 242.

And so I think it's -- it's certainly not unprecedented,
but it's also the kind -- I would -- I would note that it's
also the kind of conduct that Congress sought to outlaw because
impeding investigations into possible criminal conduct may be
the reason why you can't ultimately bring the underlying
federal charge in certain cases.  Like, there are strong
legislative interests in preserving -- in -- in outlawing
obstruction of that type for all kinds of reasons, and those
cases do get brought.

And, of course, we could provide additional cases if the

1    Court would like a list.

2         THE COURT:  That's all right.  Go ahead.

3         MS. BERKOWER:  With regard to the federal nexus, I

4    think Mr. -- Mr. Zampogna claimed that we didn't adequately

5    plead this.  And I would just point out that the only pleading

6    requirement for federal nexus is an allegation of a reasonable

7    likelihood that at least one relevant communication would have

8    been made to a federal law enforcement officer, again,

9    concerning the commission or possible commission of a crime.

10        And here the four corners of the indictment make that

11   allegation repeatedly.  In paragraph 3 it's alleged that the

12   defendants combined to hide from MPD officials the

13   circumstances of the traffic collision leading to

14   Mr. Hylton-Brown's death to prevent an internal investigation

15   of the incident and referral of the federal authorities for a

16   criminal civil rights investigation.  A similar allegation

17   appears in paragraph 14, paragraph 16, paragraph 32,

18   paragraph 33, paragraph 50, and paragraph 31; all of which are

19   detailing the ways in which there was an effort to derail the

20   proper functioning of the internal investigations at MPD such

21   that it would forestall the transmission of information to

22   federal authorities.

23        And if all of those allegations are assumed to be true,

24   which we must for purposes of that motion, that is sufficient

25   to allege the federal nexus, and there's no basis for defeating

1    it on that purpose.

2          Similarly, with regard to misleading conduct, I think

3    Your Honor asked about the definitions in 18 U.S.C. § 1515.

4    The definition of misleading conduct is in there, and I would

5    note that one of the definitions at 1515 -- I think it's

6    (a)(3)(B) -- is that intentionally omitting information from a

7    statement and thereby causing a portion of such statement to be

8    misleading or intentionally concealing a material fact and

9    thereby creating a false impression by such statement.

10         That is alleged repeatedly throughout the indictment.

11   And, in fact, in the manner and means section of the conspiracy

12   count, which is also incorporated by reference into the

13   substantive conspir- -- into the substantive obstruction

14   count -- excuse me -- the indictment makes clear that there

15   were several manner and means by which the defendants carried

16   out this effort to forestall transmission of material

17   information to federal authorities; delaying notification of

18   the traffic collision to MPD officials and, in turn, to federal

19   officials; controlling the law enforcement response to the

20   scene; willfully neglecting to collect and preserve relevant

21   information; and withholding information from the watch

22   commander and misleading him about the circumstances of the

23   traffic collision.

24         That spans the time period from the collision scene all

25   the way back to the police station, up until the point in which

this ended up -- they ended up having to provide certain -- the watch commander became aware of the nature of the death and started taking action on his own. But all of this is -- is clear that there was a scheme to engage in misleading conduct to delay the transmittal of information through the chain of command at Metropolitan Police Department and, ultimately, to federal authorities. And all of that taken as true is adequate to establish that misleading conduct is properly pled throughout the indictment.

I did want to address some of the arguments concerning -- in the briefing concerning the fact that the overt acts themselves are not criminal and that they are just -- that there's additional pleading requirements concerning a duty of some kind, to act differently, or that there was a requirement to explain just in more detail somehow that they didn't actually engage in misleading conduct because these actions were innocuous.

As the Court is, I'm sure, aware, overt acts do not have to be criminal in and of themselves. I think the defendant even concedes this in his briefing. And given the express explanation of the purpose of the conspiracy, the manner and means of the conspiracy, and then the overt acts listed, it's clear that those allegations explain how all of this conduct had the effect of carrying out the purpose of the conspiracy, which was to mislead others to obstruct a federal

1  investigation.

2      And I would note that, you know, in this -- there's

3  nothing unique about a series of overt acts that aren't

4  necessarily themselves all criminal.  I would note that in a

5  lot of white collar cases, that's the case; such as a bribery

6  case.  In a bribery case, there are a lot of -- there would be

7  a lot of acts alleged that on their own aren't criminal.

8  Elected officials can accept money from someone.  Elected

9  officials can make decisions on how to vote.

10      When you stack that up with the criminal intent, the

11  reason for which they are exchanging the quid pro quo of the

12  votes for the money, that's where the crime comes in.  That's

13  what makes it criminal, and it's sort of -- I think that's a

14  good analogy to what we have here, which is the criminal

15  intent.  The intent to mislead MPD officials and forestall the

16  transmission of information to federal authorities is the

17  criminal intent that makes the overt acts alleged in the

18  indictment in furtherance of a criminal -- of a crime.

19      And I know Mr. Sutton's reply brief said so what, who

20  cares?  None of these are criminal in and of themselves, and

21  there's no clear view from the indictment of why they are.  But

22  we would submit that given the express purpose of the

23  conspiracy listed in paragraph 32, the manner and means listed

24  in paragraph 33, of which the overt acts were used to

25  effectuate, taken as true, the indictment more than adequately

1    alleges the crime charged.

2         And I see I have run out of time, unless Your Honor has

3    further questions.

4              THE COURT:  Not at this point.

5              MS. BERKOWER:  Thank you.

6              THE COURT:  Mr. Sutton, rebuttal -- Mr. Hannon,

7    rebuttal.

8              MR. HANNON:  Thank you, Your Honor.

9         There -- there is no other case like this anywhere, and

10   there is a reason for that.  Because if Your Honor endorses the

11   government's theory of murder in this case, you will have

12   overturned every single Supreme Court decision that we've cited

13   in our brief, which says that a police pursuit of a suspect,

14   even at high speeds, which results in an adverse outcome,

15   including paralysis of the person --

16             THE COURT:  Including what?

17             MR. HANNON:  Including paralysis of the person being

18   pursued is reasonable under the United States Constitution.

19        And the reason for that -- I don't -- about seven

20   Supreme Court cases that say that, including one out of the

21   D.C. Court of Appeals.

22        The reason for that is that under Supreme Court

23   precedent, our civilization in this country makes it of

24   paramount importance that police officers protect the public.

25   And in every one of those cases, the argument on the other side

was that all they had to do was give up the pursuit. And in
every one of those cases, including the one in the D.C. Court
of Appeals, authored by Judge Fisher, they say that the suspect
is the cause of his own undoing.

So in this case, if the conduct of Officer Sutton, which
did not involve a high-speed chase, which did not involve any
contact with Hylton-Brown, is a crime, then the system of
enforcing the Constitution that every police officer in this
country is trained in will be utterly undone. The Court,
however, we suggest, has a very straightforward opportunity to
rely on those Supreme Court cases in support of the conclusion
that there is no but-for causation here. And the *Fleming* case,
interestingly, came out after this incident, which suggests to
me, I wonder what the government's theory was.

THE COURT: *Fleming* case came out after what?

MR. HANNON: I'm mistaken. Yes, it did. The *Fleming*
case came out after the incident which is the subject of this
indictment. The indictment is for an incident that occurred on
October 23rd of -- of -- excuse me. I'm mistaken. Pardon me.

But the *Fleming* case -- if you look at the instruction
in the *Fleming* case, Your Honor can look at that instruction.
By the way, the government admitted that there was no but-for
causation in the *Fleming* case. But, nevertheless, in
overturning *Roy*, they came up with this instruction. This is
at page 229.

1    The government has to prove two things beyond a

2    reasonable doubt.  First is but-for causation.  It says the

3    government must prove that the decedent's death occurred as a

4    result of an action by the defendant.  In other words, the

5    government must prove that in the absence of an action by the

6    defendant, the decedent's death would not have occurred.

7    Now, the government would have you conclude that the

8    action was following Hylton-Brown, which is permissible under

9    the Constitution.  The action, which the government says in its

10   pleading, but not in the indictment, was in, quote, flushing,

11   unquote, Hylton-Brown out into the alley [sic].  The principle

12   that the government is endorsing in this case is that a fleeing

13   misdemeanor cannot be the cause of his own injury, and that's a

14   mere act of pursuing a misdemeanor.

15          THE COURT:  I think you've said that already.

16          MR. HANNON:  All right.  Well, what I'm suggesting to

17   the Court is that if you take the government's invitation and

18   determine whether there is an action that occurred as a result

19   of that action -- and the government hasn't cited a single case

20   which would justify that conclusion in this case, particularly

21   when the conduct of the officer is -- is constitutionally

22   permissible.

23   The -- the government harks on there being no need for a

24   constitutional allegation.  Well, that's -- that's a misleading

25   argument.  Of course there's not, but they acknowledge that all

of the constitutional cases that we cite apply.  They

acknowledge the paramount importance of Officer Sutton

fulfilling his duty.  The District of Columbia City Council has

not legislated anything since 1901 regarding --

THE COURT:  Legislated what?

MR. HANNON:  The D.C. Council has not legislated

anything regarding second-degree murder except for the common

law definition.  There's been no statutory action by the

District of Columbia.

THE COURT:  What more do you need?  I mean, there's a

statute that defines second-degree murder interpreted by the

D.C. Court of Appeals.

MR. HANNON:  But it hasn't been interpreted to apply

in this case, which is my point.  If you're following statutory

construction, there's no court that has endorsed it in these

circumstances, and it doesn't -- it doesn't say anything about

law enforcement officers.  I --

THE COURT:  We've been over it.  I know it doesn't

say anything about law officers.  It says any person.

MR. HANNON:  I -- I understand.  I've made my

argument on it.  But if we're relying only on the common law,

the government has to prove that a common law --

THE COURT:  No.  They just have to prove the elements

of the statute, and the D.C. -- and the elements are set forth.

I've written about it in, I think, two opinions on your -- on

1    discovery motions.  We have the D.C. Court of Appeals case law

2    which applies.  I mean, when -- when -- after court

3    reorganization, I think everybody agreed that the D.C. Circuit

4    and this Court, when there are D.C. Code charges, applies the

5    law as written in the statute and as interpreted by the highest

6    court, quote, unquote, state, which is the D.C. Court of

7    Appeals, not the D.C. Circuit.

8         So we've got -- we've got the statute, which I've

9    written about in two opinions so far in this case, and we've

10   got *Fleming*.  And there's other cases -- *Jennings*, I think, and

11   there -- couple of others -- that are -- that may be pertinent

12   as to what the elements are and what must be charged and what

13   must be proved.

14        MR. HANNON:  So the -- I'm glad you mentioned that.

15   So the question becomes are any of those cases construing the

16   statute, which is a common law statute, applicable here?  And

17   the government cites none.  Cites none.  And none are

18   applicable here.

19        And the D.C. Court of Appeals says this is an -- an

20   enactment of the common law; so that in the absence of some

21   statutory case that's on point here that says what the

22   government says it says, you have to look to the common law,

23   and it's not in the common law.

24        But I think the job is easier for Your Honor.  If you

25   apply the first test, but-for causation of *Fleming*, you can

1 come to the conclusion there's no but-for causation. There's

2 no contact. There's -- there's -- there's nothing. There's no

3 act by the officers that, as a matter of law, provoked

4 Hylton-Brown. Hylton-Brown might have been provoked. Why was

5 he provoked? He was provoked because he had $3,156 on him.

6 THE COURT: Let's talk about what's in the

7 indictment, the four corners of the indictment. You know, this

8 is not a trial.

9 MR. HANNON: I got it.

10 THE COURT: We'll get to that if I don't dismiss the

11 indictment. It's not a motion to suppress where you would

12 argue why he was provoked, what the officers did.

13 MR. HANNON: In that case, we know that he fled

14 because he violated municipal regulations. And he has no

15 status to complain about the conduct that the police are

16 pursuing him under Supreme Court precedent. What they're --

17 what the government is saying is that this conduct provoked him

18 into doing this. The police made me do this, and the

19 Supreme Court says no.

20 THE COURT: Well -- all right. I think I've heard

21 your -- I mean, I'm not trying to cut you off, but you're

22 making the same argument you already made --

23 MR. HANNON: Let me --

24 THE COURT: -- orally and in writing.

25 MR. HANNON: Let me -- let me address -- I'm not sure

1     what the Supreme Court case is that you referred to about the

2     drug dealers.  But if Officer Sutton acts like a police

3     officer, then he has to be treated like a police officer.  He

4     didn't act like a drug dealer.  He didn't act like a murderer.

5     He didn't violate any -- any conduct.

6               THE COURT:  Why isn't that a question for the jury?

7               MR. HANNON:  Because you have to decide whether he

8     was the but-for cause of the death of Hylton-Brown.

9               THE COURT:  I agree with that; whether the but-for

10    cause has been properly alleged in the four corners of the

11    indictment.

12              MR. HANNON:  It's been alleged, but there are no

13    facts under any case that support that.  And -- and they have

14    to -- honestly, they're relying -- well, I don't want to repeat

15    their provocation.  But -- but they -- you can't ignore that

16    Hylton-Brown's status as someone who's -- who's fleeing the

17    police because he's committed a crime -- if he's absolutely

18    fleeing -- under Supreme Court precedent has no right to

19    complain that the officers don't call off the police.

20              There -- there are only a couple more points that --

21    that I would like to address.

22              Ms. Berkower seems to suggest because there's some other

23    possible federal cases that the indictment shouldn't be

24    dismissed on the obstruction side.  The indictment specifically

25    alleges that it was the -- the possible criminal offense was

referred for, quote, civil rights violations.  And she

hypothesized there are other criminal offenses, such as bribery

and contraband --

THE COURT:  No.  That's not what she said.

MR. HANNON:  I'm sorry?

THE COURT:  That had nothing to do with -- her

argument, as I understood it, was separate and apart from the

language in this indictment -- obstruction with possible

criminal offenses; her argument was in response to your

argument that, essentially, a police officer can't be charged

with common law murder because he's acting as a police officer.

And she said there's lots of crimes that a police

officer can be charged with.  If the police officer accepts a

bribe, you can't say, well, he was a police officer.  The

police officer extorts sex from a -- from someone that he or

she has arrested in exchange for dropping the charges, the

officer can be charged.

And she listed a couple of other things.  I don't think

that has to do with what the possible criminal offense for

obstruction was; only to rebut your point -- or try to rebut

your point that a police officer is -- the Constitution doesn't

cloak you with some sort of immunity from everything, even if

it was done while he was on duty.

MR. HANNON:  Your Honor, if I may, I'm sorry.  If

that's what you understood my argument to be, then --

1          THE COURT:  No.  That's what I understood

2    Ms. Berkower's response to your argument to be.

3          MR. HANNON:  Well, I understand that.  But -- but my

4    argument -- with respect to those offenses, bribery,

5    contraband, et cetera, my argument is that the city council has

6    not and cannot -- well, has not -- legislated to prohibit a

7    police officer -- I'm sorry.  Let me restate it.

8          There is no case in which a police officer engaging in

9    constitutionally permissible conduct can be charged with murder

10   in the second degree.  I emphasize who is engaging in

11   constitutionally permissible argument [sic].  Sorry for that.

12   And in those examples, bribery, contraband, the rest of that,

13   none of those charges implicate the -- the police officer's

14   conduct, which has to comply with *Graham v. Connor*.  If the

15   government agrees that *Graham v. Connor* applies here, how --

16   how can they possibly argue that the indictment is -- is

17   justifiable under the Constitution of the United States?

18         And, again, going to the sufficiency of the language in

19   the indictment, Ms. Berkower -- Ms. Berkower, again, read down

20   about writing a report, et cetera, et cetera, et cetera.

21   There's nowhere in the indictment where it's alleged or

22   explained how the police officers have any duty to do or not to

23   do all of those things that Ms. Berkower now says constitutes

24   obstruction.

25         THE COURT:  She doesn't say it.  The indictment says

                    1    it.

                    2              MR. HANNON:  It does not, Your Honor.

                    3              THE COURT:  She cited paragraphs in the indictment.

                    4              MR. HANNON:  She cited paragraphs in the indictment

                    5    that say, for example --

                    6              THE COURT:  Well, I can read the indictment too.  She

                    7    cited paragraphs in the indictment which she says alleges

                    8    obstruction.  Okay?

                    9              MR. HANNON:  They allege --

                   10              THE COURT:  I'm not -- you know, she's not going to

                   11    get me to look outside the four corners of the indictment any

                   12    more than you are.

                   13              MR. HANNON:  Nor am I.  But -- but all of the things

                   14    that the indictment seems to suggest were nefarious on the part

                   15    of the officers -- for example, deciding that Sutton was going

                   16    to write the report -- there's nothing in the indictment that

                   17    says that those things are wrong or -- or against regulations.

                   18    There's nothing that says that --

                   19              THE COURT:  Do you have anything new to say?

                   20              MR. HANNON:  Thank you, Judge.

                   21              THE COURT:  Okay.  Mr. Zampogna.

                   22              MR. ZAMPOGNA:  Yes, Your Honor.  I would just like to

                   23    focus on one point regarding the federal nexus that was brought

                   24    up.  And in our case, I would like there to be -- if you look

                   25    at what Mr. -- Officer Zabavsky did back at the station --

1  because the federal nexus only exists when there's a reasonably

2  likelihood of transmission to federal authorities.  And when he

3  received the call, which I believe was -- well, they mentioned

4  it -- that is, the government -- at page 24 of their argument

5  in their response, but it's also in the indictment.

6        That's when he learned that Mr. Hylton-Brown was injured

7  seriously enough to -- to die, and he immediately then told the

8  watch commander of this incident.  So there wasn't any

9  misleading issue there, but that's the only -- that's what I --

10  that I would suggest is the only part that would be considered

11  a federal -- could be considered a federal nexus, and it didn't

12  create that.

13        So that's all I want to point out at this point,

14  Your Honor.  Thank you.

15            THE COURT:  Thank you.

16        Ms. Berkower, is there anything you need to add in light

17  of what's been said in the last -- during the rebuttal

18  arguments?

19            MS. BERKOWER:  Your Honor, the only thing I would add

20  is the citation to *Fleming* with the date, since there was some

21  confusion about that.  The *Fleming* case was decided on

22  January 30th of 2020.  The citation is 224 at A.3d 213 before

23  the *en banc* Court of Appeals, and the incident in this case

24  occurred on October 23rd of 2020.

25        Thank you.

1          THE COURT:  Thank you.

2          All right.  Well, why don't we take a break until

3    3 o'clock.  I have 2:44.  So that will give us 15, and we'll go

4    on to the grand jury abuse argument and to the selected

5    prosecution.

6          Okay.  Thank you.  Fifteen minutes.

7          (Recess taken.)

8          THE COURT:  Okay.  Is everybody back?  I think so.  I

9    can see the court reporter, Nancy, who's the most important

10   person so we have a record of all this.

11         So we now are moving on to the second motion, which is

12   the argument to dismiss the indictment on the grounds of

13   prosecutorial misconduct before the grand jury.  Mr. Sutton has

14   made that motion.  Mr. Zabavsky has included arguments related

15   to that as well in his papers.

16         So we're going to try to do Mr. Hannon's argument in

17   20 minutes or so, and then Mr. Zampogna, and then the

18   government, and then have some time for rebuttal.  And there's

19   one subsequent thing from Mr. Zampogna, which probably

20   shouldn't take -- which won't take as long as the other two.

21         So, Mr. Hannon, if you are ready for this one, so am I.

22         MS. BERKOWER:  Your Honor, before we begin -- and my

23   apologies for interrupting.  I just wanted to inquire whether

24   the Court planned to proceed with this piece of the hearing

25   under seal given that it will be addressing a lot of matters

1  before the grand jury.

2  THE COURT:  Oh.  Is the -- is the grand jury under

3  seal?

4  MS. BERKOWER:  I think Mr. Hannon filed his motion

5  under seal, and we've since filed redacted versions of the

6  pleadings relating to that motion.  And I do see the public

7  line is attached to the Zoom; so I just wanted to raise that.

8  THE COURT:  Well, are we going to be getting into the

9  specifics of grand jury material, Mr. Hannon?  I guess we may.

10  MR. HANNON:  The only thing that I will be --

11  THE COURT:  Are we talking about testimony of

12  specific people?

13  MR. HANNON:  I can avoid that, Your Honor.

14  THE COURT:  Because you have access to the grand jury

15  transcripts, but they're not publicly available.

16  MR. HANNON:  Correct.  I believe that I can make my

17  argument without reference to the grand jury materials.

18  THE COURT:  Well, I have a suggestion, unless

19  Mr. Zampogna objects.  And the suggestion that I'm going to

20  make is that we do his motion on selective prosecution now, and

21  then we move on to the grand jury abuse with Mr. Hannon, making

22  every attempt to avoid specifics.  If he gets into specifics,

23  Ms. Berkower, you speak up.  Or if he needs to get into

24  specifics, we can hold it to the very end.  So, I mean, I'd

25  like to keep -- the court is supposed to be a public forum.  So

1    I'd like to keep it as open as possible; and maybe we don't

2    have to close any portion of it, but maybe just a small portion

3    of it.

4          So, Mr. Zampogna, does that bother you at all?  Are you

5    ready?

6                MR. ZAMPOGNA:  No, I can go forward, if you wish.

7                THE COURT:  So what we're going to --

8                MR. ZAMPOGNA:  Go ahead.  Sorry, Your Honor.

9                THE COURT:  We're going to spend -- we're going to

10   start with Mr. Zabavsky's motion, political -- I'm sorry -- on

11   selective or vindictive prosecution.  And Mr. Zampogna --

12   Mr. Sutton has not made a similar motion.  So I'll hear from

13   Mr. Zampogna and then the government and then Mr. Zampogna in

14   rebuttal.

15               MR. ZAMPOGNA:  Okay, Your Honor.  Should I begin?

16               THE COURT:  Yes, sir.  Thank you very much.

17               MR. ZAMPOGNA:  Thank you, Your Honor.

18         I brought up a claim of selective prosecution.  In this

19   case, as we've heard already through the several hours of oral

20   argument, it's a case of first impression, a very unique case.

21   There really isn't any that I've seen with these set of facts

22   across the United States, nor has there been any, really, cited

23   in relation to this charge being brought by the government.

24         And I would like the Court to consider that there was

25   and is a prima facie case for selective prosecution, which

means that the government must prove that they did not prosecute my client, Mr. Zabavsky, for improper reasons.

The definition is there has to be others similarly situated that have not been proceeded against because of this type of conduct, and the government's decision to prosecute is invidious -- not insidious -- invidious is the term -- or in bad faith according to the *Berrios* case.

Now, as I have just said in the beginning, and as has been said before, this action is very unique. There isn't any cases that have been brought that I am aware of with these set of facts with this -- with these circumstances; and we believe that my client, Mr. Zabavsky, has met the requirements of selective prosecution given his race, specifically, and that he was conducting, as we even heard earlier, constitution-protected activity, which is being a police officer.

However, even further, no officers, in addition to this charge -- well, in the obstruction charge itself, no one has been charged with this 18 U.S.C. 1512(b)(3) or 18 U.S.C. 371 as stated, which is novel. There is further evidence this prosecution was done in bad faith. There is five officers that were at the scene, and only two of them have been indicted.

Now, I'm not going to get into what happened in the grand jury because you just said we can't, but that -- that in and of itself, I think, raises some alarm. The other three

1    officers were in the car.  That can lead to one piece of

2    evidence that puts -- and several of those officers are of

3    minority status.  So I can't get into the specifics of the one

4    officer because we just said we can't talk about grand jury; so

5    I'm not going to.

6            THE COURT:  Well, we can if we -- we can if we go

7    under seal.  I don't want to deprive anybody of the right to

8    make a record.

9            MR. ZAMPOGNA:  I only have to say one sentence.  I

10    don't know if I want to go under seal for one sentence.

11            THE COURT:  Well, maybe at the end of the -- the end

12    of the whole afternoon you can --

13            MR. ZAMPOGNA:  Okay.  Yeah.

14            THE COURT:  -- come back and make your point.

15            MR. ZAMPOGNA:  Sure.  Sure.  Okay.

16        So bad faith was also established because, as I said,

17    Mr. Zabavsky was executing his constitutional rights as a

18    police officer.  These, we believe, establish the prima facie

19    case of selective prosecution.

20        Now, what's novel -- and I know it's novel for me to

21    raise this in a sense too, but we have submitted discovery

22    requests for information on January 31st, for instance, related

23    to the investigative process of the DOJ civil rights division

24    related to prior similar instances.  That request was denied.

25    However, we believe -- at a minimum, we are providing

1    sufficient evidence to obtain information about similar

2    prosecutions, if they exist.

3         Further, the government must show that their decision to

4    prosecute Mr. Zabavsky was done free of discriminatory intent;

5    and at this point, we don't believe they have.  They pretty

6    much in their response have said it just isn't.  And they

7    haven't really given us other situations that are similar to

8    this that demonstrate that is -- that isn't a reason.

9         So what we ask, Your Honor, is simple.  We ask, first,

10   for the dismissal of this indictment because of the selective

11   prosecution.  However, alternatively, we ask that we be -- or

12   we have risen to a required threshold of a credible showing of

13   different treatment of Mr. Zabavsky according to *Armstrong*,

14   which, therefore, provides him the opportunity to obtain

15   discovery that should be provided by the government assembling

16   its files to show a corroboration of our -- our request.

17        That's all I have, Your Honor.

18             THE COURT:  Let me ask you two questions.

19             MR. ZAMPOGNA:  Yes, Your Honor.

20             THE COURT:  One is usually vindictive prosecution

21   cases are based on things like -- or selective prosecution

22   cases are based on things like race, religion, national origin,

23   things like that.  Just for the record, Mr. -- is Mr. Zabavsky

24   white?

25             MR. ZAMPOGNA:  Yes, Your Honor, he is.

1          THE COURT:  And you are suggesting that one or more

2     of the officers who were not charged were minorities; correct?

3          MR. ZAMPOGNA:  Yes, Your Honor.

4          THE COURT:  All right.  And secondly, given a case

5     where a vindictive or -- or selective prosecution was brought

6     on the other ground that you raise -- namely, Mr. Zabavsky's

7     position as a police officer -- or something comparable to

8     that.  Because when I think of selective or vindictive

9     prosecution, I think of only things like race, ethnicity,

10    religion, stuff like that.  But some of the cases you cited and

11    some of the cases you found talk about bad faith prosecutions

12    or vindicative prosecutions based on something other than

13    protected classes like I've just raised:  race, religion, and

14    so forth.

15         MR. ZAMPOGNA:  No, I haven't seen that, Your Honor.

16         THE COURT:  I think that -- I think one could, in

17    common parlance and common sense, find that somebody was

18    prosecuted vindictively because you don't like police officers

19    or you don't like gamblers or you don't like -- Al Capone was

20    prosecuted for tax violations instead of all the other things

21    he did; right?  But the question is whether there's any case

22    law directly or analogous that supports that part of your

23    argument.

24         MR. ZAMPOGNA:  At this point I have not seen it,

25    Your Honor.

1          THE COURT:  Okay.

2     All right, Ms. Berkower.

3          MS. BERKOWER:  Thank you, Your Honor.

4     Your Honor, nothing that the defendant has alleged comes

5     even close to meeting the high threshold that's required to

6     establish selective prosecution.  I will remind the Court, he's

7     charged with obstruction and conspiracy only.  He's only

8     charged in Counts 2 and 3 here.  And his claim -- while we

9     dispute Mr. Hannon's claim that Count 1 is extraordinary, I

10    don't think either defendant has previously claimed at any

11    point in this litigation that Counts 2 and 3 are extraordinary.

12    So I would just point that out.

13         And when it comes to a selective prosecution claim, the

14    defendant has to make a showing that the prosecutor brought the

15    charge for reasons forbidden by the Constitution, and that's

16    from *United States v. Armstrong*, 517 U.S. Reporter 456, and the

17    year is 1996.

18         The legal standard is demanding.  It's intended to be a

19    significant barrier to the litigation of insubstantial claims.

20    That's what *Armstrong* held, and that's because of the presumed

21    regularity of grand jury proceedings.

22         I would note that racial claims, in particular, require

23    an especially strong showing.  They require a showing by the

24    defendant that the federal prosecution policy had a

25    discriminatory effect and it was motivated by discriminatory

1  purpose.  That's also from *Armstrong*.

2      And *Armstrong* further held that a racially

3  discriminatory claim requires proof that similarly situated

4  individuals of a different race were not prosecuted, and it

5  requires clear evidence of this.  So cases in which selective

6  prosecution claims have been advanced often involve studies,

7  demographic studies, that show how different individuals were

8  prosecuted or not prosecuted.  It's not just -- anecdotal

9  evidence is not permitted.

10      I would say the most recent case I found in the District

11 of D.C. in which a selective prosecution claim was addressed

12 was *United States v. Stone*.  That's 394 F. Supp. 3d 1.  That

13 was Judge Jackson's opinion from 2000 -- 2019.  Excuse me.  And

14 she noted that in order to show selective prosecution, the

15 defendant has to show he was singled out for prosecution from

16 among others who were similarly situated and that it was

17 improperly motivated.  If it's not race, it has to be some

18 other constitutionally protected right.  And that's because

19 selective prosecution claims are grounded in the Fifth

20 Amendment equal protection -- equal protection under the Fifth

21 Amendment of the Constitution.

22      So given that legal standard, there's just no showing at

23 all here that even comes close.  There was no evidence provided

24 other than the anecdotal evidence provided just a moment ago by

25 Mr. Zampogna that Mr. Zabavsky's race somehow factored into the

prosecutorial decision. There was -- he noted a few moments ago that there were people who were not white who were in the car who were not prosecuted, but he didn't explain how they were actually similarly situated to him.

Lieutenant Zabavsky was a supervisor, and there are certain allegations in the indictment that relate specifically to his conduct and his responsibilities as a lieutenant in the police department and his involvement in the incident. And Mr. Zampogna has made no showing that the other people who were not of the same race as Mr. Zabavsky somehow engaged in similar conduct and were not prosecuted.

With regard to his status as a police officer, there's no case out there -- I think Mr. Zampogna conceded he hasn't found one himself either -- that shows that there's a constitutionally protected class of police officers. It's not recognized as a constitutionally protected class. And Mr. Zampogna has put forth no other constitutional right that he is supposedly being punished for for exercising.

In the *Stone* case, the defendant alleged he was being punished and prosecuted for exercising his First Amendment rights, which is a constitutionally protected right, of course. Here, there's no allegation other than he's a member of -- of a class of police officers who themselves were not engaged in any constitutionally protected activity or are a protected class themselves.

1          And so given that these unsupported assumptions can't

2     carry the day to make the requisite showing, we'd submit that

3     there's no merit to this and the motion should be denied.

4          THE COURT:  Mr. Zampogna, anything you want to say in

5     response?

6          MR. ZAMPOGNA:  Yes, Your Honor.

7          In rebuttal, briefly, I would indicate that I think

8     there was some misstatement.  I mean, this -- this case isn't

9     just about obstruction.  The obstruction charges -- my client,

10    while only being charged with obstruction and conspiracy, is

11    connected to the other case.  There's -- there's -- they're

12    intertwined, and they're, obviously, charged together for a

13    reason.  So it is unique, and it is novel, the situation that

14    we're facing.

15         And I didn't concede there wasn't any constitutional

16    issue.  I mean, the fact that they are officers exercising

17    their duty, as we have said earlier -- and I think I said this

18    in my initial arguments -- indicated there is constitutional

19    protection to their activity itself as being police officers.

20         And that's all I have to say about it, Your Honor.

21    Thank you.

22         THE COURT:  All right.  Thank you.

23         So Mr. Zampogna has indicated there may be something

24    he'd like to say -- say in a sealed proceeding.  So why don't

25    we do this:  We'll move on to the grand jury abuse.  Mr. Hannon

1    will make every effort to avoid anything that remains under

2    seal.  If he fails or seems to be drifting into that area,

3    Ms. Berkower will advise us.  But if there are things that you

4    want us to raise under seal, I'll ask him if he can try to hold

5    that until the end, and then we can have a brief sealed

6    proceeding at the end.  And we'll close out the public line and

7    let Mr. Zampogna add the additional points he wants to make

8    about the selective prosecution claim.  And anybody who

9    needs -- prosecutor or Mr. Hannon or Mr. Zampogna -- who needs

10   to discuss anything that's still under seal can do that in the

11   closed proceeding.

12        But Mr. Hannon has said he thinks he can make most of

13   his argument, or maybe all of his argument, without discussing

14   grand jury material in a public forum.

15        Correct, Mr. Hannon?  You're on mute.

16        MR. HANNON:  Yes, sir.

17        THE COURT:  Okay.  So why don't we proceed with -- on

18   that assumption and do your best.

19        MR. HANNON:  Thank you, Your Honor.

20        Your Honor, may it please the Court.  Unfortunately, our

21   argument in our principle brief -- I won't say it's been

22   overcome, but I think it's been -- the seriousness of our

23   constitutional contentions has been exacerbated.  And we only

24   raised the issue regarding the use of the agent as a summary

25   witness in a grand jury that did not hear the bulk of the

 1  evidence, in our reply.

 2      And I have begun to take a look at the testimony of that

 3  summary witness because *Bank of Nova Scotia* in the

 4  Supreme Court was a harmless error case.  And part of the error

 5  in some of the cases that went to the Supreme Court was the use

 6  of summary witnesses --

 7      THE COURT:  So I'm -- let me make sure I understand

 8  your argument.  I mean, there are two different ways -- the

 9  term summary witness is used.  I think one is if you have

10  somebody like -- voluminous bank records or something and a

11  witness either in a grand jury or trial summarizes it.  That's

12  not what you're talking about.

13      What you're talking about is that when most of the

14  evidence -- or maybe all of the evidence was presented to

15  Grand Jury 1, it was actually Grand Jury 2 that returned the

16  indictment, and all they heard was a summary of the evidence

17  that Grand Jury 1 had heard in detail.  Is that your argument?

18      MR. HANNON:  It's more serious than that, if I may.

19  You're correct.  The agent was not a summary witness in the

20  terms that Your Honor has indicated.  I have characterized his

21  testimony as including 73 exhibits that -- and the examination

22  was meeting throughout, and it tracked basically -- I won't

23  say, necessarily, the indictment, but it tracked all the facts

24  that the government thought were critical to the indictment in

25  the case.

1          And we have -- we have yet to determine the extent to

2     which the summary is a distortion.  We have yet to determine

3     whether *Brady* material that -- should have been provided to the

4     grand jury to avoid the impression created by the government

5     that something should be one way as opposed to another.  I

6     think I'm relying on the *Samango* case, that proposition.

7          THE COURT:  Well, are you talking about the second

8     grand jury?

9          MR. HANNON:  It's -- I'll call it the indicting grand

10    jury.

11         THE COURT:  All right.  The indicting grand jury.

12         MR. HANNON:  Right.  So far there are only -- they're

13    very few witnesses whose testimony was even referred to.

14    I -- I take that back.  There was none of the testimony that

15    was referred to other than asking did Witness A say X and

16    asking leading questions about the pursuit policy, many of

17    which I believe at first blush are quite misleading.

18         However, here's the -- here's the big problem that

19    we've -- that we've also discovered.  And, again, I don't know

20    whether Ms. Berkower or Mr. Baset have a case at their

21    fingertips that says all of this is -- is perfectly all right

22    under the Constitution.  But in reviewing the testimony, here's

23    what occurred -- and, again, I haven't been able to make a

24    record of this, and I'm happy to have further opportunities

25    to -- to brief this, but we believe that this makes it even

1   more urgent that the Court require the government to produce

2   the minutes with respect to what was said in every -- in the

3   case of the presentation of every witness and what was said to

4   the indicting grand jury about the instructions in the case.

5           So here's what I proffer to the Court --

6           MS. BERKOWER:  Your Honor, I'm sorry.  I'm going

7   interject at this point.

8           I'm not sure what Mr. Hannon is going to proffer, but I

9   think we are getting pretty close to what transpired before the

10  grand jury.  There are already allusions to lines of

11  questioning that were asked and the kinds of things that were

12  asked, and I'm not sure where he's going.  But I will say I

13  know, at least in my response, I -- I will need to draw on

14  content before the grand jury, and I'm not sure where this is

15  going.

16          THE COURT:  Well, I'm -- if you're concerned about

17  it, and it's impeding the ability to make this argument -- I

18  mean, he's basically making an argument that only merged in his

19  reply brief.  And the government actually hasn't even had a

20  chance to respond to it; right?

21          MR. HANNON:  Right.  I'm not --

22          THE COURT:  Are you saying, Mr. Hannon, that

23  everything you argued in your opening brief is now mooted out?

24          MR. HANNON:  No, it's not mooted out.  It's -- it's

25  exacerbated by the following:  The government proceeded in the

1    year 2020 presenting witnesses to Grand Jury 20-1, and no other

2    grand jury heard testimony in 2020 of any of the government's

3    witnesses.  And that procedure, as I've indicated in my reply,

4    comports, in my view, with what the government is supposed to

5    do in terms of making certain that the evidence is presented to

6    a single grand jury and that they become the indicting grand

7    jury.

8         And if for some extraordinary reason that grand jury is

9    not continued and there needs consideration of another

10   grand jury, what needs to transpire in that other grand jury is

11   that the transcripts of every single witness who testified in

12   the previous grand jury need to be read to the grand jury, and

13   the preferred method is to also leave copies of the transcripts

14   with the grand jury.

15        THE COURT:  Do you have case law to support that?

16        MR. HANNON:  Yes, Your Honor.  I put -- I -- I cited

17   two treatises, one of which I think Bill Bryson was an author.

18   And in the footnote --

19        THE COURT:  He wrote the --

20        MR. HANNON:  Correct.

21        THE COURT:  Used to be -- maybe it still is.  He and

22   Professor Beale wrote the best thing on grand juries, was

23   written, at least when I was younger.

24        MR. HANNON:  Well, there -- there is -- there are

25   footnotes to that process.  I think that the treatise concludes

that's the best approach, and I've cited two cases that I found

through *Sutherland* that -- that are on point and are -- are

cited in my reply, one of which found that presentation was

absolutely improper and the indictment was dismissed.  And the

other, the Court found that the minutes of the grand jury had

to be produced because of the problem, if I'm not mistaken.

However, what the review of the transcripts discloses is

this is what took place in 2021:  Eight witnesses were

presented to Grand Jury 21-1; five witnesses were presented to

Grand Jury 21-2, which was the indicting grand jury, and among

the five was the agent.  I consider two of the witnesses who

testified before that grand jury --

THE COURT:  So are there three grand juries that were

involved here?

MR. HANNON:  No, Your Honor, there were five.

THE COURT:  Five grand juries?

MR. HANNON:  There were five grand juries that heard

testimony in --

THE COURT:  Wait, wait, wait.  Grand juries.

MR. HANNON:  Yes, sir.

THE COURT:  You first talked about Grand Jury No.

20-1.

MR. HANNON:  They heard --

THE COURT:  Then you just said Grand Jury 21-1?

MR. HANNON:  No, 21 --

1          THE COURT:  Then you said Grand Jury 21-2.

2          MR. HANNON:  I'm sorry.  I misspoke.  21-1 heard

3     eight witnesses.

4          THE COURT:  Say this again.

5          MR. HANNON:  21-1 -- Grand Jury 21-1 was presented

6     with eight witnesses.

7          THE COURT:  That's the first grand jury?

8          MR. HANNON:  No.

9          THE COURT:  So when you earlier said 20-1, you were

10    wrong?

11         MR. HANNON:  No.

12         THE COURT:  So there are three grand juries; is that

13    what you are saying?

14         MR. HANNON:  No.  There are six.

15         THE COURT:  Six grand juries?

16         MR. HANNON:  Yes, sir.

17         THE COURT:  That heard evidence in this case?

18         MR. HANNON:  Yes, sir.

19         THE COURT:  All right.  Well, I think we need

20    briefing on this.  I mean, I -- Ms. Berkower may be ready to

21    address this, but this is all -- this is all new.  It's in your

22    reply brief, but it's not really a reply brief.  You're raising

23    a whole new argument about what is and what is not

24    appropriate --

25         MR. HANNON:  I have one --

1      THE COURT:  -- in grand jury practice.  And we all

2 know that there are cases when a grand jury expires or people

3 get sick or when other things happen that a subsequent

4 grand jury gets involved, and then the question is what is

5 required of that subsequent grand jury.

6      And I suppose one could conjure up a situation where the

7 first grand jury hears 20 witnesses, but the second grand jury

8 could hear half a dozen and can find probable cause without

9 hearing everything.  And maybe -- maybe the -- they don't have

10 hear everything so long as there's enough to establish probable

11 cause.

12      And, now, I'm just talking off the top of my head

13 because I haven't read the law on all of this stuff.  But if

14 that were true in my hypothetical, 20 witnesses before the

15 first grand jury, and for some reason it expired or whatever,

16 they don't have to present the same 20 witnesses to the second

17 grand jury so long as they produce enough evidence to make out

18 probable cause.

19      But they would still have the obligation to provide you,

20 I think, with the grand jury testimony from the first grand

21 jury under Rule 6(e), because you're going to want to be in the

22 best position you can be -- either under Rule 6(e) or under

23 *Jencks*, because you want to be in the best position you can be

24 to cross-examine people who didn't appear before the indicting

25 grand jury.

What you do have to have is (a) sufficient evidence for the indicting grand jury to find probable cause, and the indicting grand jury has to see a draft of the indictment under *Gaither*, and the indicting grand jury has to vote on the actual four corners of the indictment, just -- not just the charges, but the actual indictment. But, you know, I suppose you could have -- I don't know how many grand juries, so long as the one that did the indicting had enough evidence to find probable cause. But I don't know because --

I've read your reply brief, but I haven't heard the government's position, and I haven't looked at the cases on this. This is -- this is, you know, not what we were focusing on before the reply briefs came in.

MR. HANNON: But I've acknowledged that.

May I say just a few things more so that --

THE COURT: Sure. Speak up.

MR. HANNON: -- Ms. Berkower is informed if she wants to reply on this.

What Your Honor has described is the harmless error rule, and the harmless error --

THE COURT: Go ahead.

MR. HANNON: You're --

THE COURT: I'm not sure I described the harmless error rule, but go ahead. I thought I described the grand jury practice, but go ahead.

1          MR. HANNON:  Well, so we think that the minutes need

2    to be produced.  And let me -- let me --

3          THE COURT:  Minutes of what?

4          MR. HANNON:  The minutes of the presentation to -- by

5    the government, what they said to the grand jurors that's not

6    contained within the four corners of the transcripts of --

7          THE COURT:  No.  That's a different argument.

8          MR. HANNON:  No, I don't --

9          THE COURT:  The argument is -- I thought the argument

10   was that the summary witness knew enough, the summary witness

11   before the grand jury that indicted, and you need to see the

12   summary witnesses, what the summary witness said, which I

13   assume you've already seen -- but what the summary witness said

14   to the grand jury about the prior testimony and what the

15   government instructed the indicting grand jury what their role

16   was and what happened before.

17        Why do you need the minutes of everything?  You've

18   already got the testimony of every grand jury witness; right?

19         MR. HANNON:  I do.

20         THE COURT:  And so the only thing that's left is the

21   government's instructions?

22         MR. HANNON:  Well, I don't agree with that, but let

23   me address what Your Honor believes is the only issue.

24         THE COURT:  Well, I'm -- I'm just reacting.  I don't

25   even know the government's position yet.

1          MR. HANNON:  Well --

2          THE COURT:  As you know, I've been a prosecutor, I've

3     been a defense lawyer before I was a judge.  So -- and I -- and

4     I -- Bill Bryson wrote a great treatise with Sara Beale, and I

5     admire them both.  Go ahead.

6          MR. HANNON:  Here's my concern.  The issue of grand

7     jury abuse just leaps out here.  And let me explain why.  And

8     to repeat, so there's a record here, in 2021, Grand Jury 1 had

9     heard eight witnesses.  The indicting grand jury heard five.

10    21-3 heard three.  21-4 heard four.  21-5 heard two.  And there

11    doesn't seem to me to be any explanation as to why the

12    procedure that they're following in 2020 changed.  And here's

13    the --

14         THE COURT:  Are you suggesting that Grand Jury 21-3,

15    21-4, and 21-5 heard witnesses after the indictment was

16    returned by 21-2?

17         MR. HANNON:  No.  They were all before the indictment

18    was returned, but none of their testimony was given to the

19    indicting grand jury.  And so that raises the question, why

20    were the witnesses presented in so many different grand juries

21    and will -- I don't -- was it -- was it appropriate?  If it's

22    appropriate, then the transcripts, in my view, had to be read.

23         But here -- here is what my concern is, and that is the

24    potential abuse of the grand jury process.  And let me give you

25    my first example of the potential that the minutes are going to

have to be produced to disclose, in addition to the reasons I argued before in my principle brief.  We have an immunized witness.  That witness was not presented to the indicting grand jury.  And to me -- that suggests to me that the government has abused the immunity statute to obtain the testimony of that witness just so they --

THE COURT:  Why?  Why does that suggest that to you?

MR. HANNON:  Because he wasn't presented to the indicting grand jury --

THE COURT:  So what?

MR. HANNON:  -- and -- we don't know yet.  His testimony --

THE COURT:  It may not matter as long as the grand jury had sufficient evidence to indict.

MR. HANNON:  We --

THE COURT:  You can have a summary witness in a grand jury.  Most -- most criminal cases have mostly summary witnesses at the grand jury stage.

MR. HANNON:  Most -- most -- most minor street drug cases.

Here's the issue, Judge:  The government put in Grand Jury 21-5 only two witnesses.  The witnesses were the immunized witness and another police officer, both of whom are friends of Officer Sutton.  And that -- neither of those transcripts was presented to the grand jury.  There was maybe one or two

1    questions about what Officer ████ had to say.  So there's a

2    concern that the grand jury was abused so the government could

3    cross-examine the defense witnesses in the case, in the grand

4    jury.

5            THE COURT:  Well, look.  We may have to go into --

6    into a nonpublic session, but it may be more appropriate -- and

7    I'll ask Ms. Berkower.  I mean, this is all new.  You know, I

8    spent hours reading the briefs in this case and reading the

9    cases that were cited.  And I know what I think about many of

10   the arguments made in Mr. Sutton's opening brief.  His reply

11   brief raises, like, a whole new issue.  And his argument today

12   expands on that whole new issue.

13           And maybe my instincts are right, that it's probably not

14   a problem, but maybe they're wrong.  I haven't looked at any of

15   the case law.  I haven't looked at the treatises, and I don't

16   even have a clear understanding about what really happened.  I

17   mean, two grand juries?  Three grand juries?  Six grand juries?

18           So, Ms. Berkower, how would you like to proceed with

19   respect to the arguments now made in the reply brief?

20           MS. BERKOWER:  Thank you, Your Honor.

21           I think I would like to address some of them because I

22   think we can clear up some of the questions that Mr. Hannon has

23   raised just in the confines of the hearing, even in the public

24   session.  And the first relates to -- if I may proceed,

25   Your Honor.

1      THE COURT:  Yes.

2      MS. BERKOWER:  The first relates to his allegation

3  that there was something improper about the use of multiple

4  grand juries.  I would note that in his reply, he cited no case

5  that prohibits this, and his accusations of impropriety are

6  wholly speculative.

7      I will represent to the Court that the presentation of

8  different witnesses to different grand juries in this case was

9  a matter of logistics.  Grand juries in this district sit one

10  day per week.  And in 2020 and 2021, there was an intense

11  demand for grand jury time, both due to the COVID pandemic --

12      THE COURT:  Especially with what happened after

13  January 6th.

14      MS. BERKOWER:  And after January 6th.  That's exactly

15  right.  With additional hundreds of cases that had to be

16  indicted here, as Your Honor well knows from your own caseload.

17      And conducting an extensive grand jury investigation

18  into a very serious death-resulting matter in that context that

19  required putting two dozen witnesses into the grand jury under

20  those constraints presented no small logistical challenge.  It

21  was necessary to have testimony from a number of witnesses in a

22  timely way.  Even then it took 11 months to bring this to

23  completion.

24      So against that backdrop, this is -- this was a matter

25  of logistics, and the defense allegation that there was some

1  kind of misconduct or abuse here is simply not correct, and I

2  wanted to correct the record on that from the outset.

3      Your Honor is absolutely right in that as long as the

4  grand jury that indicts the case has -- has sufficient evidence

5  to find probable cause for the charges alleged in the

6  indictment, that is all that is required.  And here there was a

7  summary witness who testified, the case agent.

8      I would note that although Mr. Hannon didn't raise this

9  until his reply brief, he was provided with those transcripts

10  on November 9th of last year.  And in his brief, he claimed we

11  buried that somehow and didn't bring it to his attention.  But,

12  in fact, in our discovery letter that accompanied that

13  production, we noted in the first paragraph that there were

14  four grand jury transcripts and related exhibits in the

15  production.  We provided a detailed log.

16      I actually have this on my screen.  I don't know if

17  Your Honor wants me to share it or not, but I -- in the

18  discovery log, there was a separate section that listed grand

19  jury materials.  It had the grand jury materials listed by

20  witness, including for the case agent, with a Bates range.  And

21  so I'm not really sure how we could have been any clearer to

22  the defense that these were materials provided relating to the

23  grand jury investigation.

24      And so Mr. Hannon actually has had since November 9th to

25  do a thorough examination of that transcript to point out any

alleged defects he may have found. There is no need to give
him additional time to pick this apart. He's had it since
November 9th, and we made it clear to him that that's what we
were providing.

And at the same time, there's no problem with this
witness's testimony because the information presented to that
grand jury was sufficient to supply probable cause. And
there's no error. There's no legally cognizable error under
the applicable case law that incomplete or even exculpatory
evidence or unreliable evidence or somehow incompetent evidence
was presented to the grand jury. As long as the indictments
are facially valid, those are not legally cognizable
challenges.

So I would submit to the Court this is one more effort
to -- to cast a nonlegally cognizable challenge and something
that is somehow abuse that requires sanction and dismissal and
evidentiary hearings and release of minutes. So that is --
that is our position with regard to the use of multiple grand
juries and with regard to the summary witness.

In addition, I would note that the cases that the
defense cited, that Mr. Hannon referenced a few moments ago,
one of them was from the Middle District of Pennsylvania from
1980. It said that -- it took issue -- the court did take
issue with the use of a summary witness in that case. That's
*United States v. Mahoney*. But that case is an outlier. And

that's just not what is recognized to be appropriate practice

in this district. And, indeed, other district courts within

the Third Circuit -- where that Pennsylvania [sic] is -- took

issue with that case contemporaneously in that same year and

reached different conclusions. And I can provide the citation

to the Court of that case, if the --

THE COURT: Well, I take it you don't want to take

the time to do a reply brief, but what might be useful is if

you send my law clerk and Mr. Hannon and Mr. Zampogna the cases

you think are relevant to responding to his argument on this

point about multiple grand juries and summary witnesses.

If you want to write a reply to it -- response to his

reply, I would be happy to accept it. If you just want to give

us some case law, that's fine too, because we've all spent a

lot of time to get to the point of today's argument.

But I do feel a little bit at sea just with his reply

brief that raises this -- this -- what to me is a new issue in

the case.

MS. BERKOWER: Your Honor, we can submit a short

reply. I don't know that I had much else to say, other than I

can -- and it does relate to one other case, which we will

provide to the Court in our reply; that judge -- Chief Judge

Howell did address similar issues, sort of this effort to go

behind nonlegally cognizable challenges to ascertain evidence

before the grand jury, whether there was probable cause, and

whether additional minutes are required.  And that was in
*United States v. Apodaca*.

THE COURT:  I've seen that case.  I've read that
case.

MS. BERKOWER:  So unless the Court has further
questions, I'm happy to defer the rest of our arguments on this
to reply.

THE COURT:  Okay.  So let's do this.  We are here
today.  So, Mr. Sutton [sic], I think you should -- I have read
carefully all of the briefs; the reply brief on this point
probably less carefully, which is why I feel a little bit
unprepared.  But I've read everything else carefully.  But this
is your opportunity to make whatever arguments you want to make
about your -- things you've said in your initial brief, as well
as the reply, or respond to what the government said in its
omnibus response.

And then we will go into a closed session -- maybe we'll
have Ms. Berkower respond; Mr. -- Mr. Zampogna speak and then
Ms. Berkower.  And then we'll go into a closed session or
whatever has to be discussed in a closed session.

MR. HANNON:  Was Your Honor referring to pleadings
from the government as -- such as Ms. Berkower offered?  I
would like to -- to prepare a pleading regarding these issues
that I'm raising.

THE COURT:  So you want -- you want to start again,

1    and that -- that means your reply brief as the main brief on

2    this issue about multiple grand juries?

3             MR. HANNON:  As -- as long as --

4             THE COURT:  Is that what you want to start again on?

5             MR. HANNON:  As long as I have an opportunity to

6    submit something in writing to the Court.

7             THE COURT:  I don't want to start again on the issues

8    that were argued at great length in Docket No. 185, the motion

9    to dismiss for grand jury abuse and disclosed grand jury

10   minutes, and by Mr. Zampogna in Docket 187 on those same

11   issues.  That's done.  That's briefed.  You've briefed it.

12            MR. HANNON:  Yes.

13            THE COURT:  Mr. Zampogna has briefed it.  The

14   government has responded.

15        And, you know, I thought a lot about those issues.  The

16   only issue I haven't thought a lot about yet is this idea of

17   multiple grand juries and -- and a summary witness.  And so you

18   want to file something on that, in addition to what you've said

19   in your reply brief?

20            MR. HANNON:  Yes, either in reply to Ms. Berkower's

21   pleading, or if you want to do conventional pleadings, I'll

22   take the lead.  She can --

23            THE COURT:  Well, let me -- let me ask Ms. Berkower.

24   How would you like to proceed?  Do you want to treat his reply

25   brief as his opening brief on this, for lack of a better term I

1    will call, new issue, and then you will oppose and he will

2    reply?  Or do you want to let him start all over again on this

3    new issue?

4         MS. BERKOWER:  I think we can treat his reply as his

5    opening brief, and we will respond to that.  And we can attempt

6    to try and actually narrow these issues for a change.

7         THE COURT:  Okay.  So what we're going to do before

8    today is over, we're going to set a schedule -- I'm going to

9    treat the reply brief, to the extent it raises this issue for

10   the first time, as an opening brief on this issue; the issue

11   being use of multiple grand juries and a summary witness.  Then

12   the government will file an opposition to that brief, Docket

13   No. -- I think it's 199.  And then Mr. Hannon will reply to

14   that.

15        And so, you know, I'm happy to dispense with any further

16   argument on that point, since we're going to have briefing on

17   it, and discuss the issues that were briefed at great length in

18   185, which I've read very thoroughly, and I've read

19   Mr. Zampogna's papers thoroughly, and I've read the

20   government's opposition very thoroughly.

21        So how do you want to do that?  Do we need to be under

22   seal for any of that or all of that or not?

23        MR. ZAMPOGNA:  I'm sorry, Your Honor.  You're

24   speaking about my --

25        THE COURT:  No.  I asked --

1          MR. ZAMPOGNA:  -- supplement?

2          THE COURT:  -- Mr. Hannon.

3          MR. ZAMPOGNA:  Oh, I apologize.

4          THE COURT:  Docket -- the initial motion to dismiss

5     for grand jury abuse, which I've read.  I get it.  I've read

6     all the cases, that's -- part of Docket 187, Mr. Zampogna's all

7     of Docket 185, and perhaps part of the reply brief, but not the

8     part of the reply brief that deals with the, quote, unquote,

9     new issue.

10         So to the extent you need oral argument on that,

11    Mr. Hannon, how much can we do in open court and how much do we

12    need to go into closed court for it?

13         MR. HANNON:  Well, I really have nothing further to

14    add, other than to reiterate, among other things, what I think

15    the importance is of knowing how the grand jury was charged

16    given the government's changing theories and --

17         THE COURT:  Changing theories or changing grand

18    juries?

19         MR. HANNON:  Changing theories.  The grand jury issue

20    we'll address in writing later.

21         So other than my emphasizing that issue to the Court,

22    that we need the minutes to be produced, among other things, to

23    understand what the charge was to the grand jury -- and I think

24    it -- I have nothing further to argue to the Court on the

25    record, and I have nothing that I need to argue to the Court

1    under seal regarding that motion.

2              THE COURT:  All right.  And, again, since we're

3    treating your reply brief as the open brief on the, quote,

4    unquote, new issue and since you represented today -- and maybe

5    also in writing -- that you have all of the grand jury

6    transcripts of witness testimony from all of the witnesses who

7    testified before all of the grand jurors; correct?

8              MR. HANNON:  According to the list that the

9    government provided.  I have everything the government gave me

10   a list of.

11             THE COURT:  So to the extent we're talking about

12   grand jury minutes with respect to the indicting grand jury, as

13   well as the other grand juries, the only thing you're really

14   talking about now is instructions given to the jury?

15             MR. HANNON:  Any colloquy that occurred in the

16   grand jury between the prosecutors and the grand jurors outside

17   the four corners of the -- of the transcript.

18             THE COURT:  Well, I assume everything is in the

19   transcript of the grand jury, but you don't -- Ms. Berkower can

20   correct me if I'm wrong.  I assume what you have -- I assume

21   what the government is providing is the testimony of every

22   witness, which includes the questions asked by the prosecutor

23   and any questions asked by the grand juror of that witness.  Is

24   that right?

25             MS. BERKOWER:  Yes, Your Honor.  And there were times

1    when the grand jury asked the questions themselves, and there

2    were times where we collected -- sent the witness out,

3    collected the questions, posed the questions.  And if there was

4    follow-up, then the grand jurors would do follow-up themselves.

5    That was -- I think that's a routine practice; but, yes, that

6    is -- those transcripts of what I just described have all been

7    provided.

8              THE COURT:  So what's missing is when the prosecutor

9    told the grand jury what the law is, told the grand jury what

10   the proposed charges were, went over the charges with them,

11   went over the indictment with them -- correct so far?  That's

12   not been provided?

13             MS. BERKOWER:  Correct.

14             THE COURT:  And if -- it's been a long time since

15   I've put a witness in a grand jury, but there are occasions

16   when you don't -- while your formal instructions may be at the

17   end, when there are questions along the way where the

18   grand jury would say:  Well, you know, for murder, do you need

19   X or for obstruction, do you need Y, that -- and you -- if you

20   responded in the middle of a grand jury session, that also

21   would not have been provided because it's not grand jury

22   testimony; correct?

23             MS. BERKOWER:  Correct.

24             THE COURT:  All right.  So those are -- those are the

25   kinds of things that Mr. Hannon wants, and he's made his

argument for those in his opening brief and, I guess, in his

reply brief, and the government's responded to those in general

terms.

The new twist is that I now know -- you-all knew much

earlier -- that there were multiple grand juries. And to me --

I'm sure Ms. Berkower may have a response to this. To me, if I

were a defense lawyer, I would really want to know what the

indicting grand jury was told about the prior grand juries and

the summary witness. But I might be less interested in what

was told to all the prior grand juries. Now the law may be the

same for both. I just -- I just don't know.

So we're going to -- on that issue, we're going to treat

Mr. Hannon's reply brief as the opening brief on the multiple

grand juries' summary witness and why the instructions are even

more important now -- or the minutes are even more important

now than they were earlier.

Ms. Berkower and Mr. Baset will respond, and then

Mr. Hannon will have a chance to reply to that. So before we

go into a closed session -- and Mr. Hannon has said he doesn't

want to -- doesn't need to say anything further on the other

arguments in Docket 185.

Mr. Zampogna, you may, if he wants to say some of that

in closed session.

What would be a schedule for these subsequent -- this

subsequent briefing on the grand jury abuse issue? So

1    Ms. Berkower is up first.

2              MS. BERKOWER:  I think we would request two weeks

3    from today as though the reply were filed today.  The local

4    rules give us two weeks to respond.  So I think we would ask

5    for two weeks from today.

6              THE COURT:  To reply to his -- to his --

7              MS. BERKOWER:  To respond to --

8              THE COURT:  -- what is in his reply brief.  Okay.  So

9    two weeks from today, which is -- today is the 26th of July,

10   which is a Tuesday.  So I guess that makes it August 9.

11         And, Mr. Hannon, what do you want afterwards?

12             MR. HANNON:  Did you happen to note the day of the

13   week?

14             THE COURT:  It's a Tuesday, August 9th, that she's

15   going to file something.

16             MR. HANNON:  The 19th.

17             THE COURT:  Sure.

18             MR. HANNON:  Thank you.

19             MS. BERKOWER:  Thank you.

20             THE COURT:  Yes.

21             MS. BERKOWER:  I think Mr. Hannon did raise an

22   argument concerning the -- his request in his initial brief

23   that I would like to address concerning the changing theory of

24   prosecution.  I don't know if we've moved off of that at this

25   point, but I would like to respond since I get the sense this

1    is our chance at oral argument on the issues raised in the

2    opening round of briefing.

3         THE COURT:  All right.  So you can respond, to the

4    extent you want to, to what he's put in 185.

5         MS. BERKOWER:  Yes.

6         THE COURT:  We are going go into a brief session --

7    nonpublic session -- so Mr. Zampogna can say what he wants to

8    say, and perhaps Mr. Hannon and Ms. Berkower as well.

9         Can I take a short break?

10         (Recess taken.)

11         THE COURT:  I'll see if everybody else is back.

12    Everybody is back.

13         THE COURTROOM DEPUTY:  The public line has been put

14    into the waiting room, Judge.

15         THE COURT:  Pardon me?

16         THE COURTROOM DEPUTY:  The public line has been

17    putting into the waiting room.

18         THE COURT:  Why don't we tell the public line to go

19    home.  We're done with the public part of these proceedings.

20         THE COURTROOM DEPUTY:  Okay.

21         THE COURT:  So everybody can talk freely.  Now, there

22    are a number of names on my screen that I don't recognize, but

23    some of them say -- I recognize Ms. Amster, a couple people

24    that say U.S. Attorney.  I assume that Harrison Richards and

25    Abraham Bluestone are authorized from one side or the other to

1    hear the sealed stuff.

2            MR. ZAMPOGNA:  Abraham Bluestone is in my office; so

3    I believe so.  Yes, Your Honor.

4            THE COURT:  So everybody here is connected with the

5    U.S. Attorney's Office or an agent of one of the defense

6    lawyers.  So they are covered.  But what transpires now will be

7    under seal and will not be transcribed unless I authorize

8    Ms. Meyer to do so.

9                         **\*\*\* SEALED \*\*\***





























1

2

3

4

5

6

7

8

9          (Proceedings were concluded at 4:32 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4 Certified Realtime Reporter, do hereby certify that the above

5 and foregoing constitutes a true and accurate transcript of my

6 stenograph notes and is a full, true, and complete transcript

7 of the proceedings to the best of my ability.

8

9          Dated this 29th day of July, 2022.

10

11         /s/ Nancy J. Meyer
            Nancy J. Meyer
12         Official Court Reporter
            Registered Diplomate Reporter
13         Certified Realtime Reporter
            333 Constitution Avenue Northwest
14         Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25